Filed 1/19/22  Blue Mountain Enterprises v. Owen CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BLUE MOUNTAIN ENTERPRISES, LLC.,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>GREGORY S. OWEN et al.,<br><br>　　　Defendants and Appellants. | A157054, A158783<br><br>(Solano County<br>Super. Ct. No. FCS049313)<br><br>**ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT]** |

**THE COURT:**

　　　It is ordered that the unpublished opinion filed on January 10, 2022, be modified as follows:

1. At the beginning of the last sentence in the last full paragraph on page 28, commencing with "the court added" is modified to read as follows:

The court also awarded $72,240 in attorney fees incurred postjudgment, for a total attorney fee award of $596,114, and awarded $84,125 in costs and expenses.

　　　There is no change in the judgment.

Date_____　　　　　_____Humes, P. J.

1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BLUE MOUNTAIN ENTERPRISES, LLC., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> GREGORY S. OWEN et al., <br><br> Defendants and Appellants. | A157054, A158783 <br><br> (Solano County <br> Super. Ct. No. FCS049313) |

In April 2011, Gregory S. Owen transferred his ownership interest in several real estate and construction-related firms he had founded to a new entity, Blue Mountain Enterprises, LLC (Blue Mountain), as part of a joint venture with Acolyte Limited (Acolyte). The joint venture was established through several interrelated contracts executed over a five-day period. Acolyte acquired a 50 percent ownership interest in Blue Mountain and Owen became the company's chief executive officer. As part of his employment contract, Owen agreed to abide by certain restrictive covenants, including a covenant barring him from soliciting Blue Mountain's customers for a three-year period following the termination of his employment.

In April 2016, Owen was terminated from Blue Mountain for cause. Months later, Owen established a new construction services company to compete with Blue Mountain. He sent a letter to several companies within

1

the building and construction trades describing this new venture, including existing customers of Blue Mountain. Blue Mountain successfully obtained preliminary and permanent injunctive relief prohibiting Owen from soliciting Blue Mountain's customers and prevailed on its motion for summary adjudication of its breach of contract claim.

In these consolidated appeals, Owen challenges the trial court's order granting summary adjudication in favor of Blue Mountain. Owen contends that the nonsolicitation covenant is unenforceable because it does not meet the requirements set forth in Business and Professions Code[1] section 16601, a statutory exemption to section 16600's general ban on noncompetition covenants. He further asserts that his communications with Blue Mountain's customers were not solicitations as a matter of law. Finally, he challenges the court's order awarding Blue Mountain approximately $600,000 in attorney fees as the prevailing party. We reject these contentions and affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Background Leading to Present Dispute

#### i. *The Formation of Blue Mountain*

Beginning in 1982, Owen founded a series of real estate development and construction businesses. One such business was Blue Mountain Air, Inc., which became a leader in the heating, ventilation, and air conditioning (HVAC) market in Northern California. In late 2010, Owen met with representatives of the Meyer Corporation U.S. (Meyer), a Chinese multinational corporation that was looking for land and development opportunities in California. Owen and Meyer decided to enter into a joint venture by which Meyer would provide the capital and management skills

---

[1] All undesignated statutory references are to the Business and Professions Code.

necessary to expand Owen's enterprises and Owen would continue to oversee the growth and expansion of these businesses. The parties agreed to form a new entity named "Blue Mountain Enterprises, LLC." Over the course of several months, Owen and Meyer negotiated four contracts to formalize the joint venture: a "Contribution Agreement" by which Owen transferred his ownership interest in all of his businesses, described in the agreements as the "Blue Mountain Entities," into a newly formed limited liability company (Blue Mountain); a "Membership Interest Purchase Agreement" by which Acolyte, a Meyer subsidiary, acquired a 50 percent ownership interest in Blue Mountain; an "Operating Agreement" for the new company; and an "Employment Agreement" that defined Owen's future management role in Blue Mountain.

The joint venture was formalized over a five-day period in April 2011. On April 22, 2011, Blue Mountain was registered as a limited liability company with the Secretary of State. That same day, Owen transferred his ownership interest of the Blue Mountain Entities to Blue Mountain under the Contribution Agreement, receiving in exchange a 100 percent membership interest in Blue Mountain.

On April 26, 2011, Acolyte acquired a 50 percent membership interest in Blue Mountain pursuant to the Membership Interest Purchase Agreement. Acolyte paid $16.5 million in exchange for its interest, $3 million of which went directly to Owen. The residual $13.5 million was retained as working capital for Blue Mountain. The Operating Agreement and the Employment Agreement were also executed on April 26, 2011. These two agreements addressed Owen's continued role in managing Blue Mountain's businesses.[2]

_____

[2] The parties also entered into a "Master Services Agreement" that included Polymathic Properties, Inc. (Polymathic). Acolyte formed

3

Under the Employment Agreement, Owen was hired to serve a five-year term as Blue Mountain's chief executive officer. The agreement included restrictive covenants providing that during his employment, and for a period of three years following the date of his termination, Owen would not "solicit for himself or any entity the business of a customer of any of the Blue Mountain Entities," and would not solicit the services of any Blue Mountain employees. By these provisions, Blue Mountain sought to protect its goodwill and reputation, as well as its relationships with existing customers. At the time, Blue Mountain's customers included D.R. Horton, KB Homes, Lennar Corporation (Lennar), Pulte Homes, Shea Homes, and Toll Brothers.

### ii. Owen Is Terminated for Cause and Forms Silvermark

In September 2015, Blue Mountain executives began investigating allegations of misconduct against Owen. On April 20, 2016, Owen was terminated for cause. That same day, Acolyte, Polymathic, and a third company filed suit against Owen alleging he had violated his fiduciary duties and engaged in self-dealing while serving as chief executive of Blue Mountain. The litigation was resolved in a confidential settlement agreement on July 15, 2016. As part of the settlement agreement, Owen agreed to sell his remaining interest in Blue Mountain to Polymathic. The parties further agreed that neither Acolyte nor Polymathic would seek to enforce the noncompetition provisions of Owen's Employment Agreement with Blue Mountain, but that "[Acolyte] and [Polymathic] make no representations, warranties, or covenants regarding any other surviving provisions contained in the Employment Agreement, including the 'Non-Solicitation' and 'Covenant Against Disclosure' provisions set forth in

---

Polymathic to fund Blue Mountain with $48 million through a combination of equity and debt.

4

Sections 5(b) and 5(f) of the Employment Agreement, *each of which Owen acknowledges and agrees remains fully enforceable by* [*Blue Mountain*]." (Italics added.)[3]

In August 2016, Owen formed a new company called Silvermark Construction Services, Inc. (Silvermark). In June 2017, Owen sent a letter by e-mail to several representatives of Blue Mountain customers, informing them that he had started Silvermark. The letter began with the following salutation: "To my friends; past and potential future clients; and the general public." The letter declared that Owen had recently sold all his interests in Blue Mountain, and that he had "made the decision to launch a new enterprise with greater perspective, more resources and a much stronger team. Conscious of the environment, evolving technology and the communities we work in, this new venture allows me to incorporate what I have learned from where I have been, while considering where the market and our world is headed." The letter introduced by name two former Blue Mountain employees who had joined Silvermark, "who combined, bring over 100 years of experience in the HVAC industry." The letter concluded: "I thank everyone who supports us in this transition and look forward to the remarkable opportunities we have ahead with our new company, Silvermark Construction Services, Inc."

After receiving the announcement, at least one of Blue Mountain's customers (Lennar) invited Silvermark to bid on multiple HVAC construction projects. Silvermark also submitted bids to provide HVAC construction

---

[3] The record on appeal contains a substantially redacted copy of the confidential settlement agreement, in which only the recitals, a confidentiality clause, and the paragraph describing the continuing enforceability of the nonsolicitation provision are made visible.

5

services to other Blue Mountain customers, including Pulte Homes, Shea Homes, and Toll Brothers.

## B. Lawsuit Commences and Preliminary Injunction Is Obtained

On August 1, 2017, Blue Mountain filed suit against Owen and Silvermark alleging causes of action for breach of contract, inducing breach of contract, intentional interference with contractual relations, and intentional interference with prospective economic relations. The complaint included a request for preliminary and permanent injunctive relief.

The claim for breach of contract was brought against Owen only. Blue Mountain alleged that Owen's Silvermark letter violated the customer nonsolicitation provision in the Employment Agreement and threatened Blue Mountain with "immediate and irreparable harm in the form of lost business and goodwill." Blue Mountain also alleged that Owen had breached the related covenant that prohibited him from soliciting employees of Blue Mountain or its subsidiary entities.

Blue Mountain moved for a preliminary injunction the day after filing its complaint. Blue Mountain acknowledged that section 16600 generally prohibits agreements that restrain competition. It asserted however that Owen's conduct fell within the exception under section 16601 which provides that the acquirer of "all of [a seller's] ownership interest" may enforce the seller's contractual promise to refrain from soliciting the sold business's customers and employees. (§ 16601; *Strategix, Ltd. v. Infocrossing West, Inc.* (2006) 142 Cal.App.4th 1068, 1072–1073 (*Strategix*).)

In his opposition to the motion, Owen argued that Blue Mountain could not demonstrate a likelihood of prevailing on the merits because the nonsolicitation covenants were unenforceable. Owen explained that because he had sold only 50 percent of his ownership stake to Acolyte and had

6

retained the remaining 50 percent for himself, section 16601 was inapplicable. He added that the partial sale of Blue Mountain to Acolyte did not include the transfer of goodwill.

In October 2017, Blue Mountain moved ex parte for a temporary restraining order (TRO) seeking to enjoin Owen "from continuing to breach his contract through his improper solicitations" and "from soliciting and retaining the services of former Blue Mountain employees."[4] Blue Mountain reported that it had recently deposed Tim Frank, one of the former Blue Mountain employees hired by Silvermark. During Frank's deposition, Blue Mountain learned that Frank and Owen had discussed forming a company to compete directly with Blue Mountain's HVAC business while Frank was still working for Blue Mountain. He and Owen had also drafted a business plan projecting revenue that would come from projects already in Blue Mountain's project pipeline. In addition, Frank had accessed more than 300 files during his last two weeks of employment with Blue Mountain. Blue Mountain asserted that Frank had no business purpose in accessing many of these files.

The trial court entered a TRO in favor of Blue Mountain. The order prohibited Owen from soliciting a list of Blue Mountain customers. Included among these customers were D.R. Horton, KB Homes, Lennar, Meritage Homes, Pulte Homes, Shea Homes, Toll Brothers, and William Lyon Homes. The order was to remain in effect until the conclusion of the hearing on Blue Mountain's pending motion for a preliminary injunction.

---

[4] That same month, Owen filed a cross-complaint for declaratory judgment under Code of Civil Procedure section 1060. Owen sought a declaration that the noncompetition provisions in the employment agreement were void under section 16600. He dismissed the cross-complaint with prejudice in March 2019.

On November 29, 2017, following a contested hearing, the trial court entered a preliminary injunction in favor of Blue Mountain. The court determined that the Employment Agreement's nonsolicitation covenants fell within the statutory exception to the general rule voiding noncompetition agreements because Owen had disposed of the entirety of his business interests when he conveyed those interests to Blue Mountain in April 2011. The court explained: "The evidence shows that through a series of inter-related contractual agreements executed within days of each other, Defendant Owen consummated a business deal in which he created a separate legal entity, Plaintiff Blue Mountain Enterprises, LLC . . . , to which he conveyed 100% of his personal interest in specific construction and real estate related businesses . . . ." Citing the parties' other related agreements, the court opined that the various contracts "were negotiated in consideration of one another as part of a global business deal between Defendant Owen and third-party Alcolyte, an affiliate of Meyer Corporation."

The trial court also observed that Owen's argument "ignore[d] several factors," including that Blue Mountain had a separate legal existence apart from Owen. The court noted that at the time Blue Mountain sold 50 percent of its interest to Alcolyte, it was Blue Mountain, not Owen, that owned the entities formerly belonging to Owen. The court also found that while none of the contracts expressly reference the sale of goodwill, the transfer of goodwill could reasonably be inferred. The order enjoined Owen from soliciting or engaging in business with Blue Mountain customers, from attempting to interfere in Blue Mountain's relationships with its customers, and from soliciting Blue Mountain employees.

On January 18, 2018, the trial court entered an amended order granting the preliminary injunction. Owen had filed a motion for

8

reconsideration based on the parties' confidential July 2016 settlement agreement, which he now lodged with the court under seal. The amended order clarified that the customer solicitation restraint applied only to companies that had been Blue Mountain customers as of April 2011.

On June 4, 2018, Blue Mountain filed a first amended complaint (FAC) adding new causes of action for misappropriation of trade secrets and unfair competition.

## C. Blue Mountain Obtains Summary Adjudication

In September 2018, Blue Mountain moved for summary adjudication of its first cause of action for breach of contract based on Owen's violation of the customer nonsolicitation covenant. (Code Civ. Proc., § 437c, subd. (f)(1).) Blue Mountain also sought a final injunction covering the duration of the Employment Agreement's three-year post-employment nonsolicitation period, ending on April 20, 2019.

In his opposition, Owen asserted that the motion was procedurally improper because it asked the court to adjudicate a discrete legal issue rather than to resolve the breach of contract cause of action. He argued that a ruling on the breach of the customer nonsolicitation term would not completely adjudicate the cause of action because the FAC also alleged that he had breached the contract by soliciting Blue Mountain employees, and Blue Mountain's motion did not seek to resolve this issue. Owen also argued that whether the Silvermark announcement constituted a solicitation or was merely an advertisement was not susceptible to resolution as a matter of law.

Owen repeated his contention that the nonsolicitation provision did not satisfy the section 16601 exception because he never sold all of his business interests, asserting he had created the Blue Mountain limited liability company merely to consolidate his businesses for personal estate and tax

9

planning purposes. He emphasized that the Contribution Agreement did not cross-reference the Employment Agreement, nor did it obligate him to sell any portion of "his new 100% ownership in [the Blue Mountain LLC]." He further maintained that even if the restrictions were lawful, triable issues of fact remained as to liability, causation, and damages.

At the hearing on the motion for summary adjudication, Blue Mountain indicated that it was waiving any claim for damages for breach of contract and would seek injunctive relief only. The trial court ordered the parties to submit additional briefing as to whether summary adjudication was appropriate in light of Blue Mountain's election of equitable relief.

On February 19, 2019, the trial court entered its order granting Blue Mountain's motion for summary adjudication. The court's detailed order concluded that Owen's letter constituted a solicitation as a matter of law. "There is no dispute the letter was sent prior to the expiration of the covenant not to solicit [Blue Mountain] customers. [Citation.] As such, Owen breached his contract. With respect to [Owen's] claim that the covenant not to solicit is void, the court incorporates by reference its legal analysis in response to [Owen's] first motion for summary judgment (See Order Denying Defendants' and Cross-complainants' Motion (11/7/18)) and second motion for summary judgment, *infra*." The court declared Blue Mountain to be "the prevailing party on this cause of action" as it had "appropriately sought and was awarded injunctive relief."[5]

On April 9, 2019, judgment was entered in favor of Blue Mountain as to the breach of contract action. The court converted the January 18, 2018

_____

[5] The trial court also summarily adjudicated Blue Mountain's cause of action for misappropriation of trade secrets in Owen's favor.

10

amended preliminary injunction into a permanent injunction which expired 11 days later—on April 20, 2019—the three-year anniversary of Owen's termination for cause.  The court reserved jurisdiction over attorney fees and costs.  Blue Mountain dismissed the FAC's remaining causes of action.  Owen filed a timely notice of appeal from the judgment.

## D.    Attorney Fees

Both Blue Mountain and Owen moved for contractual attorney fees. The motions were accompanied by thousands of pages of supporting evidence and included requests for sanctions.

On October 11, 2019, the trial court found Blue Mountain to be the prevailing party under the Employment Agreement and Civil Code section 1717.  The court stated:  "After comparing the success and failure of the litigation objectives for the parties, [Blue Mountain] is the prevailing party in its case in chief on the contract as it is the party who obtained 'greater relief in the action on the contract.' "  The court awarded Blue Mountain $596,114 in fees and $84,125 in costs and/or expenses based on the attorney fee provision in the Employment Contract.  The court denied Owen's requests for fees and costs.[6]

## II.  DISCUSSION

## A.    Summary Adjudication

" 'Summary adjudication motions are "procedurally identical" to summary judgment motions.  [Citation.]  A summary judgment motion "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  [Citation.]  To be entitled to judgment as a matter of law, the moving party must show by admissible evidence that the "action has no merit

---

[6] Owen does not appeal the denial of fees and costs.

11

or that there is no defense" thereto. [Citation.] . . . Material facts are those that relate to the issues in the case as framed by the pleadings. [Citation.] There is a genuine issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' " (*Duffey v. Tender Heart Home Care Agency, LLC* (2019) 31 Cal.App.5th 232, 240–241 (*Duffey*).)

" 'The trial court's ruling on a motion for summary adjudication, like that on a motion for summary judgment, is subject to this court's independent review.' [Citation.] 'In performing our review, we view the evidence in a light favorable to the losing party . . . , liberally construing [his] evidentiary submission while strictly scrutinizing the moving party's own showing and resolving any evidentiary doubts or ambiguities in the losing party's favor.' " (*Duffey*, *supra*, 31 Cal.App.5th at p. 241.) The court does not weigh evidence, but instead considers whether the evidence creates a triable issue of fact. (*Andrews v. Foster Wheeler LLC* (2006) 138 Cal.App.4th 96, 113.)

### i.    *Breach of Contract Claim Was Appropriately Resolved by Summary Adjudication*

Owen first contends that Blue Mountain was not entitled to summary adjudication of its claim for breach of contract because its motion did not fully resolve the cause of action. Owen observes that Blue Mountain's claim was predicated on both the alleged breach of the customer nonsolicitation covenant as well as breach of the covenant against solicitation of Blue Mountain employees. Owen relies on Code of Civil Procedure section 437c, subdivision (f)(1), which provides that a summary adjudication motion may be granted "only if it *completely disposes of a cause of action,* an affirmative defense, a claim for damages, or an issue of duty." (Italics added.)

12

A recognized exception to the statutory language above holds that where two or more separate and distinct wrongful acts are combined in the same cause of action in a complaint, a party may present a summary adjudication motion that pertains to some, but not all, of the separate and distinct wrongful acts.  (*Lilienthal & Fowler v. Superior Court* (1993) 12 Cal.App.4th 1848, 1854–1855 (*Lilienthal*).)  That is because each separate and distinct wrongful act is an invasion of a separate and distinct primary right, and each violation of a primary right is a separate and distinct "cause of action" — regardless of how the claim is presented in the complaint.  (*Id.* at p. 1853.)  Thus, to the extent the FAC's first cause of action alleged separate and distinct contractual violations, Blue Mountain was entitled to present a motion for summary adjudication as to any alleged violation.  (*Id.* at pp. 1854–1855.)

We have no difficulty concluding that Blue Mountain's customer solicitation claim and employee solicitation claim involve two different primary rights:  Blue Mountain's right to enjoy and preserve the customer goodwill it had acquired from Owen, and its right to be free from interference with its employment relationships.  Both primary rights are contractual and were conferred by two different provisions in the Employee Agreement.  The solicitation of Blue Mountain's customers thus invaded a different right and constituted a "separate and distinct" wrongful act from the solicitation of Blue Mountain's employees.  (*Lilienthal*, *supra*, 12 Cal.App.4th at pp. 1854–1855.)  Though the breaches were pleaded together in a single cause of action, they involve allegations of separate and distinct wrongful acts and damages.  Consequently, the trial court did not abuse its discretion in addressing the discrete customer solicitation claim by way of summary adjudication.

### ii. *Nonsolicitation Covenant Is Enforceable*

In California, contractual provisions that prevent a person from engaging in a profession, trade or business are generally void. (§ 16600.) As the Supreme Court has noted, "section 16600 evinces a settled legislative policy in favor of open competition and employee mobility." (*Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 946.) Blue Mountain invokes a statutory exception to this general prohibition that is found in section 16601, which states: "Any person who sells the goodwill of a business, *or any owner of a business entity selling or otherwise disposing of all of his or her ownership interest in the business entity* . . . may agree with the buyer to refrain from carrying on a similar business within a specified geographic area in which the business so sold, or that of the business entity, division, or subsidiary has been carried on, so long as the buyer . . . carries on a like business therein." (Italics added.)

"Section 16601's exception serves an important commercial purpose by protecting the value of the business acquired by the buyer. 'In the case of the sale of the goodwill of a business it is 'unfair' for the seller to engage in competition which diminishes the value of the asset he sold.' [Citation.] Thus, '[t]he thrust of . . . section 16601 is to permit the purchaser of a business to protect himself or itself against competition from the seller which competition would have the effect of reducing the value of the property right that was acquired.' [Citation.] 'One of the primary goals of section 16601 is to protect the buyer's interest in preserving the goodwill of the acquired corporation.'" (*Strategix, supra,* 142 Cal.App.4th 1068, 1072–1073.) The exception is limited: "[I]n order to uphold a covenant not to compete pursuant to section 16601, the contract for sale of the corporate shares may not circumvent California's deeply rooted public policy favoring open

14

competition. The transaction must clearly establish that it falls within this limited exception." (*Hill Medical Corp. v. Wycoff* (2001) 86 Cal.App.4th 895, 903.)

Owen renews the arguments he made in the trial court below that the customer nonsolicitation covenant is unenforceable because he did not sell all or substantially all of his ownership interests when the Blue Mountain joint venture was created, but instead sold only 50 percent of those interests to Acolyte under the Membership Interest Purchase Agreement. He suggests that the initial transfer of his ownership interests to Blue Mountain was disconnected from, and unrelated to, the joint venture, emphasizing that it was only after the transfer was completed that he, as the new company's sole shareholder, sold a 50 percent membership interest to Acolyte. In his view, he merely "consolidated all of his businesses into one LLC through a Contribution Agreement" giving him ownership of all the company's membership interests and "did not sell or dispose of any of his business or membership interests to any of the Meyer entities."

Owen's arguments are contradicted by his own sworn statements and other undisputed evidence in the record. Section 1.2 of the Contribution Agreement provides: "The Contributor [Owen] has agreed to assign, transfer, convey and contribute *all of the interests . . . in the BM Entities to the Company* [*Blue Mountain*] and, in exchange, the Company will issue one-hundred percent (100%) of the membership interest in the Company to the Contributor." (Italics added.) The "BM Entities" consisted of Owen's full ownership interests in his various companies. The Employment Agreement similarly states that "pursuant to the [Membership Interest] Purchase Agreement, the Executive [defined as Owen] has formed the Company [Blue Mountain], *has agreed to contribute to the Company all of the Executive's*

15

*ownership interests in the Blue Mountain Entities,* and has agreed to sell or cause the Company to issue a total of 50% of the membership interests in the Company to Acolyte." (Italics added.)

In Owen's sworn declaration in opposition to Blue Mountain's motion for a preliminary injunction, Owen acknowledged that he had negotiated a "joint venture with the Meyer Corporation" and that the Contribution Agreement was the first step in the achievement of that joint venture. Owen declared: "Over the course of several months, we negotiated four contracts, all of which were prepared by Plaintiff Blue Mountain Enterprises, LLC's . . . parent company's counsel. **First,** under the Contribution Agreement, I moved my ownership of the [Blue Mountain Entities] into an LLC known as [Blue Mountain]. [Blue Mountain] did not exist prior to the transaction." Owen then detailed the other three contracts that together constituted the joint venture. As the trial court aptly recognized: "The evidence is clear that four contracts were drafted and contemporaneously executed in contemplation of a global business deal. Owen previously acknowledged this and cannot in good faith create a controverted fact by submitting a declaration that conflicts with his prior declaration as well as the contracts in evidence."[7]

Owen's invocation of the subsequent sale of a 50 percent ownership interest in Blue Mountain to Acolyte misses the point. The question here is whether, as a matter of law, Owen "sold" or "otherwise disposed of" all of his businesses interests when, pursuant to the Contribution Agreement, he

---

[7] Owen's counsel who represented him in the joint venture agreements also testified at a deposition that the Contribution Agreement was "part and parcel of the entire transaction." His counsel acknowledged that the Contribution Agreement had to precede the sale of a 50 percent ownership interest in Blue Mountain to Acolyte.

16

conveyed all of his ownership stake in his various companies to Blue Mountain. While Owen initially retained ownership of all of Blue Mountain's membership shares (for four days), he did so by conveying his personal ownership in all of the Blue Mountain Entities to Blue Mountain LLC, a separate and distinct legal entity. (See *Curci Investments, LLC v. Baldwin* (2017) 14 Cal.App.5th 214, 220 ["Ordinarily a corporation is considered a separate legal entity, distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations. [Citation.] The same is true of a limited liability company (LLC) and its members and managers."].) Contrary to Owen's contentions on appeal, he received valuable consideration in return for his contribution by receiving a 100 percent membership interest in the new company. (See *Hilb, Rogal & Hamilton Ins. Servs. v. Robb* (1995) 33 Cal.App.4th 1812, 1824 (*Hilb*) [discussed below].) Owen unquestionably "sold" or "otherwise disposed of" his entire ownership stake in the Blue Mountain Entities when he conveyed that interest to Blue Mountain under the Contribution Agreement. (*Ibid.*)

Owen seeks to avoid this result by asserting that Acolyte is "the party through which Blue Mountain sought to enforce the allegedly anticompetitive covenant." Not so. The plaintiff in this case is Blue Mountain, the sole entity that acquired all of Owen's business interests under the Contribution Agreement and assumed contractual obligations with Owen under the Employment Agreement at issue in this appeal.

Owen also challenges whether Blue Mountain can enforce a nonsolicitation covenant that is contained in the Employment Agreement rather than the Contribution Agreement. As discussed above, the Contribution Agreement was part of a global joint venture comprised of four interrelated contracts that must be read together. Blue Mountain's ability to

17

enforce the nonsolicitation covenant is not undone by the fact that this provision is found in one contract in a multi-contract joint venture rather than another.

*Hilb*, *supra,* 33 Cal.App.4th 1812, is instructive. In *Hilb*, the plaintiff acquired an insurance brokerage firm that was co-owned by the defendant. As part of the acquisition, the parties executed a merger agreement. The merger agreement did not contain a covenant not to compete but required the defendant to sign a separate employment contract. (*Id.* at p. 1817.) The employment contract contained a noncompetition covenant that extended for three years following the termination of the defendant's employment with the new company. The defendant received shares of the new company worth $245,000 in exchange for transferring his shares in the sold company. He was also paid $52,500 in consideration for the covenant not to compete. (*Id.* at pp. 1817–1818.) After the defendant quit his job to work for a competitor, the plaintiff sued for misappropriation of trade secrets and breach of the employment contract's covenant not to compete. (*Id.* at p. 1818.)

The appellate court upheld the trial court's denial of a motion for a preliminary injunction, finding that the harm to the defendant in enforcing the noncompetition covenant tipped decidedly in favor of not issuing an injunction. (*Hilb, supra*, 33 Cal.App.4th at p. 1822.) The *Hilb* court then elected to address certain legal issues to "clarify or narrow the issues for the trial court in any future proceedings." (*Id.* at p. 1823.) The appellate court concluded that the defendant had "sold" or "otherwise disposed of" his shares in the insurance brokerage firm that was merged into the new firm. By exchanging his shares in the sold company for shares in the new company, the defendant had received valuable consideration and had disposed of his entire ownership stake in the sold business. (*Id.* at pp. 1824–1825.)

The *Hilb* court further concluded that placement of the covenant not to compete in the employment contract, rather than in the merger agreement, did not affect the covenant's enforceability under section 16601: "As permitted by [section 16601], [the defendant] agreed that after the merger, he would refrain from carrying on a business similar to the [plaintiff's business]. The validity of that covenant is not affected by its location in the employment contract rather than the merger agreement. Nothing in section 16601 requires that the covenant be contained in a particular type of document. The purpose of the statute is served as long as the covenant is executed in connection with the sale or disposition of all of the shareholder's stock in the acquired corporation." (*Hilb*, *supra*, 33 Cal.App.4th at pp. 1825–1826; see also *Vacco Industries, Inc. v. Van Den Berg* (1992) 5 Cal.App.4th 34, 42–43, 48; *Alliant Ins. Services, Inc. v. Gaddy* (2008) 159 Cal.App.4th 1292, 1294; *Fillpoint v. Mass* (2012) 208 Cal.App.4th 1170, 1178–1181.)

Here, the trial court correctly found that section 16601 applies as a matter of law because Owen "dispos[ed] of all of his . . . ownership interest" under the Contribution Agreement while concurrently agreeing under the Employment Agreement to "refrain from carrying on a similar business within a specified geographic area in which the business so sold." (§ 16601.) While the Contribution Agreement and the Employment Agreement do not cross-reference each other, it is undisputed that both contracts, along with other contracts the parties executed in April 2011, were drafted to accomplish the Blue Mountain joint business venture. As the trial court noted below, "[r]ules of contract interpretation require that when several contracts relating to the same matters are made between the same parties and as parts of substantially one transaction, the contracts are to be construed together. (Civ. Code, § 1642.)"

19

In sum, Blue Mountain has established that no material dispute existed as to the enforceability of the contractual provision prohibiting Owen from soliciting Blue Mountain's customers.

### iii. Announcement of Silvermark Was a Solicitation

Owen next asserts that the trial court erred in holding as a matter of law that the Silvermark letter he sent to Blue Mountain's customers constituted a "solicitation," contending that a fact finder could conclude that the letter was merely a nonactionable advertisement. We disagree.

The trial court found the letter was clearly a solicitation: "In this case, it is undisputed that the letter emailed by [Owen] was not sent to the public at large, but targeted to business members of the building trade who purchase HVAC systems which included Legacy Customers of [Blue Mountain]. Further, the evidence shows the emails were not sent generically to the businesses, but were emailed to multiple individuals within each business. *This individualized and targeted contact is not consistent with an advertisement or promotional activity directed to the public at large.*" (Italics added.) The court concluded the letter constituted a solicitation as a matter of law because it "does more than simply announce a new affiliation; it 'petitions, importunes and entreats' to targeted individual employees of past customers, including Legacy Customers, to leave [Blue Mountain] for better opportunities at Silvermark."

While there are no cases directly addressing the meaning of "solicit" or "advertisement" in the context of section 16601, "[a]t common law, the boundary separating fair and unfair competition in the context of a protected customer list has been drawn at the distinction between an announcement and a solicitation." (*American Credit Indemnity Co. v. Sacks* (1989) 213 Cal.App.3d 622, 634 (*Sacks*).)

20

In *Aetna Building Maintenance Co. v. West* (1952) 39 Cal.2d 198 (*Aetna*), the Supreme Court addressed this distinction: " 'Solicit' is defined as: 'To ask for with earnestness, to make petition to, to endeavor to obtain, to awake or excite to action, to appeal to, or to invite.' [Citation.] 'It implies personal petition and importunity addressed to a particular individual to do some particular thing, . . .' [Citation.] It means: 'To appeal to (for something); to apply to for obtaining something; to ask earnestly; to ask for the purpose of receiving; to endeavor to obtain by asking or pleading; to entreat, implore or importune; to make petition to; to plead for; to try to obtain.' " (*Id.* at pp. 203–204.) In contrast, the *Aetna* court found that "[m]erely informing customers of one's former employer of a change of employment, without more, is not solicitation. Neither does the willingness to discuss business upon invitation of another party constitute solicitation on the part of the invitee. Equity will not enjoin a former employee from receiving business from the customers of his former employer, even though the circumstances be such that he should be prohibited from soliciting such business. " (*Id.* at p. 204.)

In *Sacks,* an accounts receivable insurer (ACI) sought a preliminary injunction against a former employee who had started her own business using the insurer's customer list. (*Sacks, supra*, 213 Cal.App.3d at p. 626.) When she resigned, she sent a letter to those customers stating: " 'After almost fifteen years as both an agent and policyholder, I have left [ACI] and am very pleased to announce the formation of an independent insurance agency. [¶] I shall continue to specialize in Credit Insurance but will now primarily be representing Fidelity and Deposit Company of Maryland [F&D], who [*sic*] is offering companies a very interesting alternative to the types of policies being written by both [ACI] and Continental. If you would like to

21

learn more about the [F&D] policy, I will be happy to discuss it in detail with you when you are ready to review your ongoing credit insurance needs at renewal time. [¶] In the meantime, ACI will assign a new agent to your policy.  If I can be of assistance to you during the transition period or answer any questions for you at any time, please do not hesitate to call me. [¶] I have really enjoyed our past association and hope we don't lose touch!' " (*Ibid.*)

The appellate court concluded that the letter went beyond an announcement and amounted to a solicitation:  "Although the letter begins as an announcement of her departure from ACI and affiliation with F&D, it soon assumes a different tone.  Sacks informs ACI's customers of the interesting competitive alternative F&D offers as compared to ACI's policies. She invites their inquiry about the F&D policy and indicates she would be happy to discuss it in detail when they are ready to renew.  She personally petitions, importunes and entreats ACI's customers to call her at any time for information about the better policies F&D can provide and for assistance during the agent transition period. [¶] Phrased in the terms used in the *Aetna* definition, Sacks is endeavoring to obtain their business.  Sacks, in a word, solicited.  Therefore, as a matter of law, Sacks's letter . . . constituted a solicitation." (*Sacks*, *supra*, 213 Cal.App.3d at pp. 636–637.)

Owen's Silvermark letter closely resembles the letter at issue in *Sacks*. The letter was specifically addressed to his "past and potential future clients."  He boasted that his new venture, Silvermark, was a superior alternative to Blue Mountain, having "greater perspective, more resources and a much stronger team," including two former Blue Mountain employees "who combined bring over 100 years of experience in the HVAC industry." The letter was a direct appeal for future work and was sent directly to select

representatives of Blue Mountain's corporate customers. Thus, the letter constituted a solicitation as a matter of law.

The Silvermark letter does not resemble transmittals that courts have found to be nonactionable. For example, in *Moss, Adams & Co. v. Shilling* (1986) 179 Cal.App.3d 124, departing employees of an accounting firm announced the formation of a new accounting business to clients the employees had serviced on behalf of their former firm. The announcement merely stated: " 'John D. Shilling and Cynthia L. Kenyon, formerly with Moss Adams, are pleased to announce the formation of a new partnership: Shilling, Kenyon & Co.[,] Certified Public Accountants[,] Lloyds Bank Building[,] One Almaden Blvd., Suite 1110[,] San Jose, CA 95113[,] (408) 295-3822.' " (*Id.* at p. 127.) The appellate court affirmed summary adjudication in favor of the employees based upon the *Aetna* rule that " '[m]erely informing customers of one's former employer of a change of employment, without more, is not solicitation.' " (*Ibid.*)

As is plain from the contents of the letter, the Silvermark letter went well beyond this type of an announcement by actively encouraging Blue Mountain customers to leave Blue Mountain and do business with Silvermark. The facts concerning this claim are not in dispute, and Owen does not describe what further factual development would be required to resolve this question. Accordingly, the trial court correctly found that the Silvermark letter constituted a solicitation as a matter of law.

### iv. Owen's Affirmative Defenses Are Forfeited

Owen argues that Blue Mountain failed to overcome his affirmative defenses relating to competitive privilege, trade secrets, and waiver. Specifically, he asserts that the parties' 2016 settlement agreement released him from all past acts and obligations as an owner, giving Blue Mountain the

23

authority to pursue him as a former employee only.  Because nonsolicitation terms are void as a matter of law between an employer and an employee unless necessary to protect trade secrets, and because the identities of the builders who received the Silvermark letter are widely available, he claims Blue Mountain cannot assert their identities are a trade secret and therefore the nonsolicitation term necessarily violated section 16600.

Owen's arguments are unconvincing for several reasons. It appears that Blue Mountain was not a party to the 2016 settlement agreement and therefore would not be bound by its terms.  (See *ante,* pp. 4–5 & fn. 3.)  More to the point, because Owen provides only a substantially redacted copy of the confidential settlement agreement in the record on appeal, with only certain provisions made visible, we are unable to evaluate what claims were released under the agreement.  Under fundamental principles of appellate review, a trial court's judgment is presumed to be correct and the appellant "has the burden of providing an adequate record.  [Citation.]  Failure to provide an adequate record on an issue requires that the issue be resolved against [the appellant]."  (*Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502.)  As noted above, the most we can glean from the appellate record is that Owen acknowledged under the settlement agreement that Blue Mountain *retains* the right to enforce the nonsolicitation covenants of the Employment Agreement against him.  If a separate provision of the settlement agreement suggests otherwise, it was incumbent on Owen to provide a more complete copy of that agreement in support of his claims.  We conclude the argument has been forfeited.

**B.     Attorney Fees**

In the second consolidated appeal, Owen contends that the trial court erred in determining Blue Mountain to be the prevailing party and awarding

attorney fees. He also asserts that even if the determination was correct, the amount of fees awarded is excessive. We disagree.

### i.    *Applicable Legal Principles*

In an action on a contract, Civil Code section 1717 permits an award of reasonable attorney fees to the prevailing party where the contract specifically provides for them. Civil Code section 1717 defines "prevailing party" as "the party who recovered the greater relief in the action on the contract." (Civ. Code, § 1717, subd. (b)(1).) Here, the relevant attorney fee provision is found in the parties' Employment Agreement and provides: "If an action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the losing party will be responsible to the prevailing party for all reasonable attorneys' fees, costs and expenses incurred by the prevailing party."

"When a party obtains a simple, unqualified victory by completely prevailing on or defeating all contract claims in the action and the contract contains a provision for attorney fees, [Civil Code] section 1717 entitles the successful party to recover reasonable attorney fees incurred in prosecution or defense of those claims" as a matter of right. (*Scott Co. v. Blount, Inc.* (1999) 20 Cal.4th 1103, 1109.) But "if neither party achieves a complete victory on all the contract claims, it is within the discretion of the trial court to determine which party prevailed on the contract or whether, on balance, neither party prevailed sufficiently to justify an award of attorney fees." (*Ibid.*; Civ. Code, § 1717, subd. (b)(1).)

"[I]n deciding whether there is a 'party prevailing on the contract,' the trial court is to compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar

25

sources.  The prevailing party determination is to be made only upon final resolution of the contract claims and only by 'a comparison of the extent to which each party ha[s] succeeded and failed to succeed in its contentions.' " (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 876.)  *"[I]n determining litigation success*, courts should respect substance rather than form, and to this extent should be guided by 'equitable considerations.' "  (*Id.* at p. 877.)  That a party recovered "less than the amount he prayed for does not make his adversary the prevailing party within the meaning of Civil Code section 1717."  (*Buck v. Barb* (1983) 147 Cal.App.3d 920, 926.)  "A trial court has wide discretion in determining which party is the prevailing party under [Civil Code] section 1717, and we will not disturb the trial court's determination absent 'a manifest abuse of discretion, a prejudicial error of law, or necessary findings not supported by substantial evidence.' "  (*Silver Creek, LLC v. BlackRock Realty Advisors, Inc.* (2009) 173 Cal.App.4th 1533, 1539.)

### ii.    *Application*

Owen challenges Blue Mountain's status as the prevailing party, noting that it pursued many causes of action before focusing exclusively on the breach of contract claim, and waited until the last minute to narrow its contract claims to a breach of the customer nonsolicitation provision.  He asserts that "[h]ad Blue Mountain abandoned its damages and invoked Owen's contractual provision from the outset, it would have incurred no fees beyond the amended preliminary injunction."  Owen also notes that Blue Mountain abandoned its claims for alleged breaches of contract relating to its employee solicitation claim, asserting that "[s]uch a meager 'victory' cannot form the basis for an award of nearly $600,000 in attorney fees.

The trial court was well aware of the extent to which Blue Mountain succeeded in this litigation.  In finding Blue Mountain to be the prevailing

26

party under Civil Code section 1717, the trial court noted that Blue Mountain secured a temporary restraining order, a preliminary injunction, and a permanent injunction against Owen based on the breach of the customer nonsolicitation covenant. The court also acknowledged that Blue Mountain's other contractual claims were not adjudicated and that Blue Mountain had waived recovery of monetary damages. Additionally, the court noted that the causes of action for misappropriation of trade secrets and unfair competition were dismissed following summary judgment, and that Blue Mountain had thereafter voluntarily dismissed its remaining claims.

While we agree with Owen that Blue Mountain did not achieve all of its litigation goals, the trial court carefully considered this factor, and it disallowed a significant amount of attorney fees incurred by Blue Mountain where its law firm's activities did not meaningfully advance the objective of enforcing the nonsolicitation covenant. These disallowed fees activities included filing an amended complaint to allege claims for misappropriation and unfair business practices and conducting discovery on these claims, as well as unsuccessfully opposing several motions filed by Owen and Silvermark.

It is true that the trial court found that Blue Mountain's contract claim "was essentially resolved following the preliminary injunction issued November 29, 2017." Importantly, however, the court observed that Blue Mountain was thereafter forced "to defend numerous and repetitive challenges . . . to the preliminary injunction," including responding to Owen's and Silvermark's demurrers, ex parte applications for a TRO, a motion to modify the undertaking, a motion for trial preference, and a motion to dissolve the preliminary injunction. The trial court carefully considered the procedural record and voluminous contentions by the parties, and determined

that Blue Mountain was the prevailing party on its breach of contract cause of action. We find no abuse of discretion in the court's determination.

### iii. *The Award Is Not Excessive*

"The amount of an attorney fee to be awarded is a matter within the sound discretion of the trial court. [Citation.] The trial court is the best judge of the value of professional services rendered in its court, and while its judgment is subject to our review, we will not disturb that determination unless we are convinced that it is clearly wrong. [Citations.] The only proper basis of reversal of the amount of an attorney fees award is if the amount awarded is so large or small that it shocks the conscience and suggests that passion and prejudice influenced the determination." (*Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1134.)

Without providing any citation to the record, Owen contends that Blue Mountain's fees and costs should not have exceeded $205,557 and $4,495.70 respectively. It is unclear how Owen derived these figures, and "[i]t is not the function of this court to comb the record looking for the evidence or absence of evidence to support [a party's] argument." (*People ex rel. Reisig v. Acuna* (2010) 182 Cal.App.4th 866, 879.) The contention is forfeited.

Owen also asserts that Blue Mountain failed to properly comply with the trial court's directives to apportion its fees and costs. Yet he does not cite to any cases or statutes that would authorize this court to overturn the attorney fee award on that basis. Blue Mountain sought approximately $2.5 million in attorney fees through judgment yet the court awarded only $523,874, reducing recoverable hours and lowering counsel's rates to conform to the rates local to Solano County. The court added $72,240 for fees incurred postjudgment.

28

The record reflects that the trial court was diligent in arriving at its attorney fee determination.  The trial court judge noted at the hearing on attorney fees that the parties had filed cross-motions for fees along with a deluge of supporting papers, commenting on the "sheer Herculean effort to slog through all of these motions, all of the compendiums, all of the evidence." The judge noted that she had "reviewed each and every single billing entry . . . [and] analyzed whether it was an appropriate award based on what I could tell from the contents of the entry."  While Blue Mountain maintains that the award should have been higher, it does not challenge the ruling on appeal.  The judge was within her discretion to reduce fees for what she deemed to be unnecessary or unrelated work and to also use rates local to Solano County for Blue Mountain's counsel.  We have no basis on which to conclude that the court's attorney fee award was "clearly wrong" or that the court otherwise abused its discretion in determining the amount of the attorney fee award.

### III.  DISPOSITION

The judgment and the order awarding Blue Mountain its attorney fees are affirmed.

                            _____

                            Sanchez, J.

WE CONCUR:


_____

Humes, P. J.


_____

Banke, J.

A157054, A158783