[No. B083345. Second Dist., Div. One. Apr. 6, 1995.]

HILB, ROGAL AND HAMILTON INSURANCE SERVICES OF
ORANGE COUNTY, INC., Plaintiff and Appellant, v.
STANLEY R. ROBB, Defendant and Appellant.

**COUNSEL**

Armstrong & Tabor and Stephen H. Tabor for Plaintiff and Appellant.

Stern, Neubauer, Greenwald & Pauly and Mark A. Neubauer for Defendant and Appellant.

## OPINION

**MASTERSON, J.**—In the trial court, plaintiff-employer successfully sought a preliminary injunction precluding defendant, a former employee, from using its trade secrets. However, the trial court denied the employer's application for injunctive relief to enforce a covenant not to compete. Each party appeals. We conclude that the trial court properly declined to enforce the noncompetition covenant but erred in enjoining the former employee's alleged misuse of trade secrets.

## BACKGROUND

In 1980, defendant Stanley R. Robb became employed by Infantino & Company (the Agency), an insurance brokerage firm. Together with Raymond Infantino (Infantino), Robb was an owner of the Agency. In 1984, the Agency was acquired by Fairmont Insurance Company, and in 1987, Fairmont was acquired by Transamerica.

In 1991, Robb and Infantino reacquired the Agency from Transamerica through a new corporation in which Infantino owned 65 percent of the stock, and Robb owned the remaining 35 percent. They purchased the Agency from Transamerica for $1 million by making a down payment of $50,000, assuming a promissory note for $700,000, and agreeing to purchase $250,000 of consulting services from Transamerica over a five-year period.

Shortly after reestablishing the Agency, Robb and Infantino learned that plaintiff's parent company—Hilb, Rogal and Hamilton Company (HRH)— was interested in acquiring it. They received a document from HRH entitled, "Stock Purchase Proposal for Infantino & Company" (the proposal), which described the principal terms of a possible transaction. The proposal, dated June 13, 1991, provided in part: "Should negotiations progress to the state [where] HRH and [the Agency] are interested in executing an acquisition document, the final agreement will be structured based upon concepts summarized herein . . . . A typical HRH acquisition would provide for the acquisition of a prospective candidate by merger. In the cas[e] of [the Agency], the legal form of the transaction would be for HRH to acquire [the Agency's] outstanding stock in exchange for shares of HRH's common stock. The intent of both parties would be to structure a 'tax-free' exchange of stock. A value placed on [a] non-compete provision in the employment agreement for the principals would be separately agreed upon."

Under the heading "Pricing," the proposal specified the dollar value of the HRH shares Robb and Infantino would receive. It then stated that "the above

pricing for the stock of the corporation [HRH] contemplates all [A]gency assets being purchased including goodwill, name, expiration rights, furniture, fixtures and equipment necessary to operate the agency." Under the heading "Compensation," the proposal stated that "the principals . . . of [the Agency] will enter employment agreements . . . with appropriate non-compete/non-piracy clauses." The proposal also contained a list of "key requirements in a possible acquisition," which included the following item: "All key executives and producers of [the Agency] would enter into an employment agreement, with appropriate non-compete and non-piracy clauses, satisfactory in form and substance to HRH."

After discussing HRH's proposal between themselves, Robb and Infantino entered into negotiations for HRH's acquisition of the Agency. Eventually, Robb received two documents—an "Agreement of Merger" and an "Employment Agreement And Covenant Not To Compete"—which Infantino asked him to sign.

The agreement of merger, dated August 1, 1991, stated that the Agency would be merged with one of HRH's wholly owned subsidiaries and that the surviving entity would then exchange all of its stock for shares in HRH. Pending the merger, Robb and Infantino were obligated by the merger agreement to "preserve for [HRH] the goodwill of [the Agency's] customers." The agreement also required Robb and Infantino to sign employment contracts with the surviving corporation on or before the date of closing.

The employment contract, dated August 27, 1991, provided that Robb would be employed by the new corporation created "under that certain merger agreement dated August 1, 1991." The contract established an initial, three-year term of employment with possible one-year renewals thereafter. It also contained a covenant not to compete, which provided that for a three-year period after the termination of employment, Robb would not solicit or accept the business of his employer's customers or prospective customers and would not engage in any competing business in the counties of Los Angeles, Ventura, San Bernardino, Riverside, San Diego, and Orange. As compensation for the covenant not to compete, the contract stated that Robb would receive $52,500.

Robb signed both the merger agreement and the employment contract.

Effective September 1, 1991, the Agency merged with a wholly owned subsidiary of HRH. As contemplated by the merger agreement, Robb transferred all of his shares in the Agency to HRH, and, in exchange, he received HRH stock having a market value of $245,000. He also received $52,500 as

consideration for the covenant not to compete.[1] The entity created by the merger—Hilb, Rogal and Hamilton Insurance Services of Orange County, Inc. (Hilb)—became Robb's new employer and is the plaintiff in the action below.

In February 1994, Robb resigned his employment with Hilb and went to work for a competing firm, Pettit-Morry Co.[2] By letter dated February 23, 1994, Hilb informed Pettit-Morry that Robb's employment with it violated the provisions of his employment contract with Hilb. Robb's employment with Pettit-Morry terminated on March 2, 1994, apparently as a result of Hilb's letter.

On March 11, 1994, Hilb filed the action below alleging, among other things, that Robb had unlawfully used its trade secrets and had violated the covenant not to compete. On March 15, 1994, Hilb applied for a temporary restraining order and preliminary injunction to stop Robb's alleged misuse of trade secrets, i.e., his alleged use of Hilb's customer information to solicit its business. Hilb also sought to enjoin Robb's violation of the covenant not to compete. The trial court denied the temporary restraining order but issued an order to show cause as to whether a preliminary injunction should issue.

After briefing and oral argument, the court issued a minute order on March 30, 1994, granting in part and denying in part Hilb's application for a preliminary injunction. The court enjoined Robb, in pertinent part, from "making any use whatsoever of the following trade secrets of [Hilb]: [¶] A. The amounts and types of insurance purchased by [Hilb's] customers and accounts; [¶] B. Expiration and/or renewal dates on all policies of insurance maintained by [Hilb's] customers and accounts; [¶] C. All information relating to leads for potential customers; [¶] D. Information relative to the needs and anticipated needs of [Hilb's] customers and accounts as communicated to [Hilb] by said customers and accounts; and [¶] E. Information regarding the history of [Hilb's] customers and accounts."[3]

The court denied injunctive relief on the covenant not to compete because it found that Hilb was not likely to prevail in "asserting the viability of the

---

[1] As part of the merger, HRH also assumed the Agency's $700,000 promissory note to Transamerica as well as its obligation to purchase $250,000 in consulting services from Transamerica. If this additional consideration is apportioned between Robb and Infantino according to their premerger shares in the Agency, Robb received stock and other benefits worth approximately $577,500 as total consideration for the merger, not including the value of the employment contract or the consideration paid for the covenant not to compete.

[2] The parties dispute whether Robb's resignation was voluntary.

[3] Robb does not challenge the portion of the injunction requiring that he return certain documents to Hilb. He claims there are no such documents.

covenant." The court noted that there were "unanswered factual issues as to the intent of the parties in constructing the merger." It also stated that the covenant might be invalid because it was contained in the employment contract, not in the merger agreement.

Robb timely appealed from the portion of the order granting a preliminary injunction on the trade secret claim. Hilb timely appealed from the portion of the order denying a preliminary injunction to enforce the covenant not to compete.

## DISCUSSION

"The law is well settled that the decision to grant a preliminary injunction rests in the sound discretion of the trial court. [Citations.]" (*IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69 [196 Cal.Rptr. 715, 672 P.2d 121].) "A trial court will be found to have abused its discretion only when it has ' "exceeded the bounds of reason or contravened the uncontradicted evidence." ' [Citations.]" (*Ibid.*) "Further, the burden rests with the party challenging the [trial court's ruling on the application for an] injunction to make a clear showing of an abuse of discretion. [Citations.]" (*Ibid.*)

"[T]rial courts should evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued." (*IT Corp.*v. *County of Imperial, supra* 35 Cal.3d at pp. 69-70.)

■ An appeal from an order *granting* a preliminary injunction involves a limited review of these two factors—likelihood of success on the merits and interim harm. If the trial court abused its discretion on either factor, we must reverse. (*Carsten* v. *City of Del Mar* (1992) 8 Cal.App.4th 1642, 1649 [11 Cal.Rptr.2d 252].)

On the other hand, when a trial court *denies* an application for a preliminary injunction, "it implicitly determines that the plaintiffs have failed to satisfy either or both of the 'interim harm' and 'likelihood of prevailing on the merits' factors. On appeal, the question becomes whether the trial court abused its discretion in ruling on *both* factors. Even if the appellate court finds that the trial court abused its discretion as to one of the factors, it nevertheless may affirm the trial court's order if it finds no abuse of discretion as to the other." (*Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d 277, 286-287 [219 Cal.Rptr. 467, 707 P.2d 840].)

■ Regardless of whether the trial court has granted or denied an application for a preliminary injunction, if the evidence before that court was in conflict, we do not reweigh it or determine the credibility of witnesses. "[T]he trial court is the judge of the credibility of the affidavits filed in support of the application for preliminary injunction and it is that court's province to resolve conflicts." (*Monogram Industries, Inc.* v. *Sar Industries, Inc.* (1976) 64 Cal.App.3d 692, 704 [134 Cal.Rptr. 714].) Further, if the evidence on the application is in conflict, we must interpret the facts in the light most favorable to the prevailing party and indulge in all reasonable inferences in support of the trial court's order. (*American Academy of Pediatrics* v. *Van de Kamp* (1989) 214 Cal.App.3d 831, 838 [263 Cal.Rptr. 46].)[4]

With these guidelines in mind, we examine first the injunction prohibiting Robb's use of Hilb's trade secrets. We will then turn to the trial court's denial of injunctive relief on the covenant not to compete. Plainly, what we decide today does not constitute a final adjudication of the ultimate rights in controversy. (See *Cohen* v. *Board of Supervisors*, *supra*, 40 Cal.3d at p. 286; *Wilkinson* v. *Times Mirror Corp.* (1989) 215 Cal.App.3d 1034, 1039-1040 [264 Cal.Rptr. 194].) In reviewing the propriety of a ruling on an application for a preliminary injunction, we merely decide whether the trial court abused its discretion based on the record before it at the time of the ruling.

## A. *The Trade Secret Injunction*

Hilb contends that its customer list and other client information constitute protectible trade secrets under the Uniform Trade Secrets Act (the UTSA) (Civ. Code, §§ 3426-3426.10). The UTSA defines a "trade secret" as information that: "(1) [d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (Civ. Code, § 3426.1, subd. (d).)

The evidence below established that after Robb resigned his position with Hilb, four of the one hundred twenty clients he had serviced at Hilb moved their accounts to his new employer, Pettit-Morry. Substantial evidence also supported the conclusion that Robb was attempting to move the accounts of two additional Hilb clients and that his efforts to switch one of them began while he was still employed by Hilb.

---

[4]The foregoing principles, though general in nature, govern preliminary injunctions in the trade secret context (*ABBA Rubber Co.* v. *Seaquist* (1991) 235 Cal.App.3d 1, 17-22 [286 Cal.Rptr. 518]) and in the area of covenants not to compete (*Metro Traffic Control, Inc.* v. *Shadow Traffic Network* (1994) 22 Cal.App.4th 853, 857-860 [27 Cal.Rptr.2d 573]).

Robb responded to Hilb's charge of misusing trade secrets by establishing that he did not "solicit" any of Hilb's clients. He simply informed some of them that he was changing employment, and they responded by asking him to move their accounts to Pettit-Morry or to seek a quote on a particular type of insurance.[5]

Our Supreme Court has previously distinguished solicitation—which is actionable—from announcing a job change—which is not: "Merely inform-ing customers of one's former employer of a change of employment, without more, is not solicitation. Neither does the willingness to discuss business upon invitation of another party constitute solicitation on the part of the invitee. Equity will not enjoin a former employee from receiving business from the customers of his former employer, even though the circumstances be such that he should be prohibited from soliciting such business. [Cita-tions]." (*Aetna Bldg. Maintenance Co.* v. *West* (1952) 39 Cal.2d 198, 204 [246 P.2d 11].)

Although *Aetna* involved a claim of unfair competition under common law, the rule in that case also governs the use of customer lists under the UTSA. In *American Credit Indemnity Co.* v. *Sacks* (1989) 213 Cal.App.3d 622 [262 Cal.Rptr. 92], the court examined the *Aetna* rule and concluded that it "is correct and survives the enactment of the UTSA." (*Id.* at p. 636.) As stated in *Sacks*: "[T]he right to announce a new affiliation, even to trade secret clients of a former employer, is basic to an individual's right to engage in fair competition. Therefore, the acquisition of trade secrets under circumstances giving rise to a duty to limit their use . . . clearly allows for such an announcement. To hold otherwise unnecessarily would contravene widely accepted and well-established business practices." (*Ibid.*)

In this case, even assuming that Hilb's customer list and other client information constitute trade secrets—an issue we do not decide—the evi-dence before the trial court does not support the conclusion that Robb misused them. He lawfully informed some of Hilb's clients of his change in employment and then complied with their instructions to move their ac-counts or to seek a quote on a desired type of insurance. Because Robb could legitimately conduct business with Hilb's clients in this manner, those clients could provide him with the type of information included in the trial

---

[5]In addition to his own uncontradicted declaration on the issue of solicitation, Robb submitted the supporting declarations of three Hilb clients. Of the four clients who actually moved their accounts to Pettit-Morry, two submitted declarations; of the two clients appar-ently contemplating such a move, one submitted a declaration. All of these declarations indicate that Robb merely announced a change in employment and then responded to the clients' lawful business requests.

court's injunction. In other words, assuming that the information Hilb possessed about its clients (e.g., amount and types of insurance) is a trade secret, nothing in the UTSA prohibits the client itself from providing that information to Robb.[6]

Because the trial court abused its discretion in finding that Hilb was likely to prevail on the merits of the trade secret claim, we reverse the portion of the order granting a preliminary injunction.

### B. The Covenant Not to Compete

#### 1. Interim Harm

As stated, Hilb appeals from the trial court's denial of injunctive relief on the covenant not to compete. We must affirm that ruling if the court acted within its discretion as to either the "likelihood of success on the merits" factor or the "interim harm" factor. (*Cohen* v. *Board of Supervisors, supra,* 40 Cal.3d at p. 287.) In evaluating interim harm, the trial court compares the injury to the plaintiff in the absence of an injunction to the injury the defendant is likely to suffer if an injunction is issued. (*IT Corp.* v. *County of Imperial, supra,* 35 Cal.3d at pp. 69-70.) Although the minute order is silent on the issue of interim harm, we assume that the trial court implicitly decided that issue against Hilb.

The trial court obviously resolved the interim harm factor in Hilb's favor in issuing the trade secret injunction, but it properly reached the opposite conclusion in denying an injunction on the covenant not to compete. The scope of relief is quite different under the two claims. The trade secret claim, at most, prevents Robb's use of certain information about Hilb's clients, but it does not bar him from competing with Hilb altogether; he can still compete provided he does not use Hilb's trade secrets.

In contrast, the covenant not to compete, if enforced, would prevent Robb from engaging in any competitive activities in Southern California for the three-year period after his termination. As a practical matter, the covenant not to compete acts as a complete bar to Robb's engaging in his profession while the trade secret limitation simply regulates the manner in which he can

---

[6]Under the UTSA, it does not matter that, while still employed by Hilb, Robb may have informed some of the firm's clients of his impending departure and then acted on their instructions to move accounts to Pettit-Morry. The timing of his job change announcement does not convert otherwise lawful behavior into prohibited solicitation. Whether such conduct violates Robb's fiduciary duty, as alleged in the complaint, or some other duty, is not before us.

compete. Thus, the harm to Robb under an injunction enforcing the covenant not to compete is significantly greater than the harm under a trade secret injunction.

Of course, the harm that an injunction would impose on Robb must be compared to the harm that Hilb would suffer without an injunction. For several reasons, that comparison tips decidedly in Robb's favor. First, as of the date of the hearing on the preliminary injunction (Mar. 29, 1994), Robb had not been working in the insurance industry since his termination at Pettit-Morry earlier in the month (on Mar. 2). Thus, he was not competing with Hilb. Second, before leaving Pettit-Morry, Robb informed the Hilb clients who had followed him that they should rescind the transfer of their accounts to Pettit-Morry. Finally, the trial court could legitimately conclude that the financial hardship placed on Robb by an injunction would outweigh the monetary injury to Hilb absent an injunction. (See *Robinson* v. *Jardine Ins. Brokers Intern. Ltd.* (N.D.Cal. 1994) 856 F.Supp. 554, 559 & fn. 20 [in ruling on application for preliminary injunction to enforce noncompete provision, court can consider relative size and financial strength of the parties].)

Because the trial court did not abuse its discretion in implicitly finding against Hilb on the factor of interim harm, we affirm the denial of a preliminary injunction to enforce the covenant not to compete.

### 2. *Likelihood of Success on the Merits*

Having found that the trial court properly resolved the factor of interim harm, we need not review the court's conclusion on the likelihood of success on the merits. However, given our reversal of the trade secret injunction, we appreciate that with a slight change in circumstances (e.g., Robb obtains employment with a competing firm), the trial court may again be faced with a request for a preliminary injunction to enforce the covenant not to compete. ■ Moreover, it is appropriate for us to reach questions of law presented by an appeal where their resolution will clarify or narrow the issues for the trial court in any future proceedings, including the trial. (*Hunter* v. *City of Whittier* (1989) 209 Cal.App.3d 588, 596 [257 Cal.Rptr. 559].)

Although we do not review the broader question of Hilb's likelihood of success on the merits, we do find it prudent to resolve two issues related to the merits: (1) whether a merger is the type of transaction that permits the execution of a valid noncompetition covenant; and (2) whether a covenant not to compete is enforceable if it appears in an employment contract but not

in a merger agreement. Both of these issues have been fully briefed in the trial court and on appeal. While the trial court concluded that factual disputes precluded the resolution of these matters, we find that they present questions of law on the record before us. Given the importance of the issues to the case, we choose to address them now.

### a. *Whether the Merger Was a Sale or Disposition of Shares*

On the first issue, we conclude that the merger between the Agency and the HRH subsidiary is the type of transaction that permits the execution of a valid covenant not to compete. Subject to certain exceptions, Business and Professions Code section 16600 renders a covenant not to compete invalid. (*Radiant Industries, Inc.* v. *Skirvin* (1973) 33 Cal.App.3d 401 [109 Cal.Rptr. 96].)[7] However, section 16601 of the code makes enforceable a reasonable noncompetition covenant executed by "any shareholder of a corporation selling or otherwise disposing of all his shares in said corporation." The question here is whether Robb "sold" or "otherwise disposed of" his shares in the Agency when it was merged with HRH's wholly owned subsidiary.[8]

A shareholder "sells" his stock when he gives it "to another for money or other valuable consideration." (Webster's Third New Internat. Dict. (1981) p. 2061, col. 3.) The fact that the seller receives shares in another corporation as consideration for the stock in his own company does not make the transaction any less a sale. (See *Radiant Industries, Inc.* v. *Skirvin, supra,* 33 Cal.App.3d 401 [exchange of shares constituted a "sale" under section 16601 but covenant not to compete invalid because defendant-employee did not sell *all* of his shares in predecessor corporation].) Indeed, the courts have long recognized that a merger consisting of an exchange of shares is a "sale" for purposes of the federal securities laws. (See, e.g., *SEC* v. *National Securities, Inc.* (1969) 393 U.S. 453, 467 [21 L.Ed.2d 668, 680, 89 S.Ct. 564]; *Junker* v. *Crory* (5th Cir. 1981) 650 F.2d 1349, 1359 & fn. 15.)

In this case, Robb unquestionably transferred *all* of his Agency shares to HRH, and he received valuable consideration for them. As the written merger proposal and the merger agreement make clear, by purchasing Robb's and Infantino's shares, HRH acquired all of the Agency's assets,

---

[7]Section 16600 states: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

[8]We decide only the question of whether the Agency-HRH merger is a "sale" or "disposition of" stock within the meaning of Business and Professions Code section 16601. We do not reach any issues concerning the scope of the covenant or its reasonableness.

including its goodwill. The economic realities of the transaction compel the conclusion that Robb "sold" his Agency shares to HRH.[9]

Moreover, Business and Professions Code section 16601 applies not only to a "sale" of all shares but also to a "disposition of" them. We find that Robb "disposed of" his Agency shares within the meaning of the statute. "The thrust of Business and Professions Code section 16601 is to permit the purchaser of a business to protect himself or itself against competition from the seller which competition would have the effect of reducing the value of the property right that was acquired." (*Monogram Industries, Inc.* v. *Sar Industries, Inc.*, *supra*, 64 Cal.App.3d at p. 701.) One of the primary goals of section 16601 is to protect the buyer's interest in preserving the goodwill of the acquired corporation. (64 Cal.App.3d at p. 701.)

We find that Robb "disposed of" all of his Agency shares by exchanging them for shares in HRH. This conclusion furthers the purpose of Business and Professions Code section 16601 in that the covenant not to compete, if enforceable, will prevent Robb from reducing the value of the assets HRH acquired. Further, the merger proposal and the merger agreement indicate that HRH considered the Agency's goodwill to be a valuable asset. If the covenant is not valid under section 16601, Robb can dilute that goodwill by competing with the entity he sold.

Because Robb sold or disposed of all of his Agency shares, the noncompetition covenant is valid under Business and Professions Code sections 16600 and 16601.

### b. *The Location of the Covenant*

██ Business and Professions Code section 16601 provides that a shareholder of a corporation who sells or otherwise disposes of all of his shares "may agree with the buyer to refrain from carrying on a similar business." Robb argues that the agreement allowed by section 16601—the covenant not to compete—is void here because it is contained in the employment contract and not in the merger agreement. We refuse to read such a requirement into the statute.

As permitted by Business and Professions Code section 16601, Robb agreed that after the merger, he would refrain from carrying on a business similar to the Agency. The validity of that covenant is not affected by its

---

[9]Robb argues that Business and Professions Code section 16601 does not apply because he retained his postmerger shares in HRH. The pertinent inquiry, however, is whether he sold all of his shares *in the Agency* at the time of the merger. He clearly did.

location in the employment contract rather than the merger agreement. Nothing in section 16601 requires that the covenant be contained in a particular type of document. The purpose of the statute is served as long as the covenant is executed in connection with the sale or disposition of all of the shareholder's stock in the acquired corporation. Section 16601 does not prescribe a format for a covenant not to compete, and we can find no reason to impose one.

In this case, the merger proposal described how HRH would acquire the Agency and stated that Robb would have to "enter [an] employment agreement[] with appropriate non-compete/non-piracy clauses." Further, the merger agreement and the employment contract cross-referenced each other.[10] Moreover, the merger proposal described the noncompetition covenant as a "key requirement" of the transaction, leaving no doubt that the covenant was a necessary condition of the merger. Finally, as part of the merger process, Robb was paid $52,500 solely for the noncompetition covenant. In light of these facts, the merger agreement and the employment contract should be construed together to effectuate the purpose of the covenant. (See Civ. Code, § 1642 ["Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together"].)[11]

Robb's reliance on *Vacco Industries, Inc.* v. *Van Den Berg* (1992) 5 Cal.App.4th 34 [6 Cal.Rptr.2d 602] is misplaced, given the facts of the Agency-HRH merger. In *Vacco,* the shareholder/employee signed two agreements in connection with the sale of his stock: an employment contract containing a covenant not to compete and a separate noncompetition agreement. After being terminated, the employee began to solicit the employer's customers, and the employer then sued him for breach of the noncompetition agreement. The employer did not seek to enforce the covenant not to compete in the employment contract, and the parties did not address its validity. (*Id.* at p. 43, fn. 4.) The jury found that the employee had breached the noncompetition agreement, and the employee appealed. In concluding that the noncompetition agreement was enforceable under Business and Professions Code section 16601, the court gratuitously commented that the covenant not to compete in the employment contract was of "questionable validity under Business and Professions Code section 16600." (5 Cal.App.4th at p. 43, fn. 4.) However, that dictum was expressly based on the fact that the employment contract and the noncompetition agreement

---

[10]Both documents also bear the words "DRAFT DATE 07/30/91," printed in boldface, in the upper right-hand corner of the first page. This fact confirms that the documents were part of the same transaction.

[11]Contrary to Robb's contention, the integration clause in the merger agreement does not prevent the courts (or the trier of fact) from concluding that Robb had to sign the employment contract (with a noncompetition covenant) as a condition of the merger.

"neither cross-referenced [n]or referred to [each] other." (*Id.* at p. 43.) Presumably, the court doubted that the employment contract was executed as part of the sale of stock. (See *id.* at p. 43, fn. 4.)

No such doubts exist here. Robb's employment contract (containing the covenant not to compete) and the merger agreement cross-referenced one another, indicating that Robb agreed to the covenant as part of the stock sale. Further, the written merger proposal—a document not present in *Vacco*—made clear that the covenant not to compete was a requirement of the merger. Thus, unlike the situation in *Vacco*, the documentary evidence before us establishes that Robb agreed to the noncompetition covenant in his capacity as a selling shareholder/employee, not solely as an employee. Accordingly, we do not find the *Vacco* dictum applicable.

In sum, Business and Professions Code sections 16600 and 16601 do not render the noncompetition covenant invalid simply because it appears in the employment contract and not in the merger agreement.

## Disposition

The portion of the trial court's order granting plaintiff's application for a preliminary injunction is reversed, and the portion of the order denying a preliminary injunction is affirmed. Defendant Stanley Robb is entitled to recover costs on appeal.

Spencer, P. J., and Ortega, J., concurred.

A petition for a rehearing was denied May 2, 1995.