Filed 12/22/23  VCA Animal Hospitals v. Hampel CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| VCA ANIMAL HOSPITALS, INC., Plaintiff and Respondent, v. NANCY HAMPEL, Defendant and Appellant. | D081424 (Super. Ct. No. 37-2022-00036623-CU-BC-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Affirmed.

Murchison & Cumming, Anton Handal, and Adesh Singh for Defendant and Appellant.

Blank Rome, Cheryl S. Chang, Travis Jang-Busby, and Jessica A. McElroy for Plaintiff and Respondent.

### INTRODUCTION

Nancy Hampel, DVM, appeals an order granting a preliminary injunction requested by her former partner and employer, VCA Animal Hospitals, Inc. (VCA).  The injunction prohibits Hampel from practicing veterinary medicine at a veterinary facility next door to the clinic she sold to

VCA. The order also requires Hampel to refrain from holding herself out as affiliated with the neighboring facility. Hampel contends the noncompetition agreement she signed when she sold her business interest to VCA is unenforceable under Business and Professions Code[1] sections 16600 and 16601 because the term of the agreement concludes five years after she terminated her employment with VCA. She also contends the court granted relief not requested by VCA and that the injunction is overly broad and vague. We disagree with each contention. We conclude the trial court properly exercised its discretion when it issued the preliminary injunction. VCA demonstrated a likelihood of prevailing based on an enforceable noncompetition agreement and the relative harm balanced in favor of granting the injunction. We further conclude Hampel had adequate notice of the relief requested and the preliminary injunction is not overly broad or vague. We, therefore, affirm the order.[2]

---

[1] All further statutory references are to the Business and Professions Code unless otherwise specified.

[2] Hampel initially filed a petition for writ relief on January 9, 2023, seeking a stay of the preliminary injunction. She filed an appeal of the same order on January 27, 2023, for which the court used the same appellate docket number (D081424). After considering an informal response from VCA and an informal reply, we denied Hampel's petition for writ of mandate/supersedeas (order issued Feb. 3, 2023, D081424). Since this opinion disposes only of Hampel's appeal, we refer to the parties by their designations associated with the appeal. Similarly, we confine the counsel listing to only those who appeared in the appeal.

# BACKGROUND[3]

A. *VCA Enters Into Partnership with Hampel and Johnson*

VCA describes itself as "a family of hometown animal hospitals committed to making a positive impact for pets, people, and the communities it serves." VCA identifies established veterinary practices to purchase and operate. Sometimes it partners with the veterinarians who built a practice, other times it buys the practice. When VCA acquires an established practice, VCA relies on the ability to acquire the goodwill of the practice to continue serving the existing clients.

In 2007, Hampel and her husband, Richard Johnson, entered a partnership with a VCA subsidiary to merge their respective veterinary practices. Hampel and Johnson, through their corporation Creative Veterinary Services, Inc. (Creative), held 75 percent interest in the partnership. The VCA subsidiary held a 25 percent interest. The new partnership operated where Hampel and Johnson had their practice—600 Broadway in El Cajon, California—under the name Animal Medical Center of El Cajon, L.P.

B. *VCA's Buyout and Covenants Not to Compete*

Several years later, VCA decided to exercise the partnership agreement's buyout option. Hampel and Johnson sold their interest in the practice to VCA in 2014 for $5,258,240. VCA continues to operate the practice under the name VCA Animal Medical Center of El Cajon (VCA El Cajon).

---

[3]   At a motion for a preliminary injunction, the trial court is required to make certain findings, expressly or by implication. We defer to these findings to the extent they are supported by substantial evidence. (*Alliant Ins. Services, Inc. v. Gaddy* (2008) 159 Cal.App.4th 1292, 1309.) Accordingly, we view the facts in the light most favorable to the prevailing party, VCA.

As required by the purchase agreement, and in consideration for VCA purchasing their interest in the practice, both Hampel and Johnson executed noncompetition agreements. The purchase agreement allocated $235,966 of the purchase price to those agreements.

Hampel agreed she would not work with a companion animal hospital within a 20-mile radius of VCA El Cajon. Hampel also agreed not to solicit VCA employees or customers to leave VCA El Cajon. Hampel negotiated an exemption permitting her involvement in a veterinary technician training school.[4]

---

[4] We focus on Hampel's noncompetition agreement, which is the agreement at issue in this appeal. Her noncompetition agreement provided in pertinent part, "During the term hereof, [Hampel] agrees that, within a twenty (20) mile radius . . . of the Premises, [Hampel] shall not, without the prior written consent of VCA Sub, directly or indirectly, own, manage, operate, join, control, finance or participate in the ownership, management, operation, control or financing of, or be connected as an officer, director, employee, principal, agent, representative, consultant, investor, owner, partner, stockholder (except as a holder of less than one percent (1%) of the issued and outstanding voting stock of a publicly held corporation), member, manager or joint venturer or otherwise permit [Hampel's] name to be used by or in connection with, or lease, sell, or permit to use any real property or interest therein owned by [Hampel], to any companion animal veterinary medical practice. . . . Notwithstanding the foregoing, this does not preclude [Hampel] from either directly or indirectly owning, managing, operating, joining, controlling, financing or participating in the ownership, management, operation, control or financing of or be connected as an officer, director, employee, principal, agent, representative, consultant, investor, owner, partner, stockholder, member, manager or joint venture, or otherwise permit [Hampel's] name to be used in connection with, or to lease, sell or permit to use any real property or interest therein owned by [Hampel] in a veterinary technician training school."

Companion animals include dogs, cats, and small exotic species such as rabbits, minks, hamsters, gerbils, or rats.

The noncompetition agreement specified the term of the agreement: "The term of this Agreement shall commence on the date hereof and shall terminate on the date which is the later to occur of the following:  (i) that date which is five (5) years following the date hereof; or (ii) that date which is five (5) years following the last date on which [Hampel] is employed at [VCA El Cajon]."

C. *Hampel's Continued Practice with VCA El Cajon While Forming All God's Creatures Animal Hospital*

Hampel continued practicing with VCA El Cajon as a VCA employee. She also served as medical director of VCA El Cajon. Hampel left VCA El Cajon on March 10, 2022, telling VCA she intended to retire.

In early 2022, Hampel and Johnson formed All God's Creatures Animal Hospital, Inc. (AGC), a veterinary facility next door to VCA El Cajon.  The articles of incorporation and statement of information submitted to the California Secretary of State listed Hampel as a director and secretary.

D. *Dispute Arises Upon Hampel's Departure from VCA El Cajon*

Soon after Hampel left VCA El Cajon, she posted an announcement on a personal Web site stating, "We are very excited to announce that Dr. Nancy Hampel will be relocating to her new privately owned veterinary practice along with her husband Dr. Richard Johnson.  In April 2022, their new animal hospital All God's Creatures Animal Hospital will open at its location 616 Broadway El Cajon, CA 92021."

VCA sent a cease and desist letter to Hampel advising her that she was violating the noncompetition agreement by opening a competing veterinary practice next to VCA El Cajon.  If she continued, VCA intended to pursue all legal and equitable remedies, including seeking injunctive relief as authorized by the noncompetition agreement.

5

The parties met informally and engaged in two mediations over several months, but they were unable to resolve the dispute. They scheduled a third mediation session and VCA asked Hampel and Johnson to refrain from opening AGC until they completed negotiations. Nevertheless, AGC opened in early September 2022 when Johnson began seeing patients.

Hampel said she was self-employed, but served as the dean and senior instructor at the Vet Tech Nursing Academy. She denied that AGC hired her. She is, however, an officer and director of Vet Tech Nursing Academy.[5]

She claims everything she does at AGC is for teaching purposes. She agreed AGC offers veterinary services to patients in connection with the teaching academy. More than 75 percent of the patients treated at AGC are seen for teaching. Hampel estimates that 25 percent of the patients they see at the facility are former VCA patients.

E. *VCA Sues and Seeks a Temporary Restraining Order*

After informal negotiations failed, VCA sued Hampel for breach of contract, breach of implied covenant of good faith and fair dealing, breach of the duty of loyalty and unfair competition. VCA filed an amended complaint adding claims against Johnson and AGC for intentional interference with contractual relations, civil conspiracy, and unfair competition. VCA prayed for a preliminary and permanent injunction, general and punitive damages, restitution, disgorgement, costs of suit, and attorney fees.

VCA also applied for a temporary restraining order. In support of its request for a restraining order, VCA declared Hampel's association with AGC

---

[5] Hampel described a veterinary technician as someone licensed by the state to perform certain tasks on animals that unlicensed people may not perform, "they are independent thinkers as a critical part of the veterinary care team." She likened them to a registered nurse in human medicine.

"robs VCA El Cajon of the goodwill she built at her former practice, which is the same goodwill that VCA purchased . . . . Since 2014, Dr. Hampel has continued to build goodwill at VCA El Cajon by her position as Medical Director. She has now acted to deprive VCA El Cajon of that goodwill by opening a competing practice that is next door to VCA El Cajon."

In response, Johnson submitted a declaration stating he built a veterinary teaching hospital "as a part of a comprehensive Animal Wellness Campus," which "includes facilities for animal rehabilitation, dog training, farm animal care, a dog therapeutic exercise course, and a water therapy pool." The campus included a "Veterinary Technician Training Academy" designed to train new veterinary technicians in "animal veterinary medicine" and qualify them for certification. Johnson confirmed the hospital was open and he was seeing patients.

Johnson said he purchased the property at 616 Broadway in El Cajon in 2006 (before he and his wife formed the partnership with the VCA subsidiary), "for the specific purpose of building a veterinary technician training school in the future." His own agreement not to operate a companion animal veterinary medical practice within 20 miles of VCA El Cajon expired five years after Johnson terminated a consulting relationship with VCA in July 2015. As of October 2022, he was proceeding with his plan to develop a veterinary technician and nurse training school. The veterinary hospital portion of the campus was open and he was seeing patients. He was working with a local college and a high school to offer veterinary technician education. Hampel, a board certified surgical specialist, was to teach "the didactic and clinical skills required" to sit for a national veterinary technician accrediting exam.

According to Johnson, VCA had its own brand recognition in San Diego County with 40 veterinary practices in the county, including two within two miles of the VCA El Cajon practice.

Hampel also submitted a declaration saying she and Johnson signed agreements limiting their ability "to own a companion animal (dogs, cats, exotics) veterinary medical practice within 20 miles of [VCA El Cajon]." The agreement, however, gave "an exemption for a veterinary technician training school" without limiting "how we educate, train, and prepare our students." She claimed she was not violating the noncompetition agreement because the training services were different from a companion veterinary practice.

Hampel and Johnson submitted a declaration from their accountant. He said the parties agreed in 2014 to a valuation formula to determine the sale price for their share of the partnership. The buyout price was calculated based on 75 percent of the gross revenues for the prior 12 months less certain liabilities. The formula did not consider the value of any asset, including goodwill. The parties allocated $235,966 of the purchase price to the noncompetition agreements.

The accountant said VCA could use the allocated amount as the goodwill value and then amortize that value over 10 years. This would make the 2022 remaining value of goodwill only $47,193.20, which is 20 percent of the original value. He, therefore, valued Dr. Hampel's goodwill at only $23,596.60.

The court granted VCA a temporary restraining order as to Hampel, but denied the request for a temporary restraining order as to Johnson. The court restrained and enjoined Hampel from "performing ANY veterinary medical services at [AGC] located at 616 Broadway El Cajon, CA 92021 unless such services are rendered in connection with performing her

responsibilities at a veterinary technician training school." The court set a hearing for a preliminary injunction.

F. *The Court Grants the Preliminary Injunction*

VCA moved for a preliminary injunction to enjoin both Hampel and Johnson, as well as their "officers, agents, employees, representatives, and all persons acting in concert or participating with them, from performing any veterinary services at [AGC] . . . until the conclusion or judgment" of this action. VCA said it sought an injunction "with a scope broader than the TRO" to prevent Hampel "from circumventing her noncompetition agreement with VCA and exploiting the goodwill she built at her prior practice to Defendants' new competing business." VCA contended Hampel remained in violation of the noncompetition agreement despite the TRO. It presented evidence she was advertising her association with the new hospital on its Web site and was operating a veterinary technician training school at the hospital. It alleged Johnson benefited from Hampel's breach of the noncompetition agreement.

In opposition, Hampel and Johnson contended there were two noncompetition agreements, one that ran for five years from the date of the sale of the practice in July 2014, and the other that extended for five years from the date Hampel terminated her employment. They argued the noncompetition agreement tied to the end of her employment was not enforceable under section 16600. They also contended the request for a broader injunction was inappropriate because there was no evidence Johnson violated his agreement.

Johnson submitted a new declaration with substantially the same information he provided earlier. He reported the facility had 12 students enrolled in the veterinary technician program. Dr. Hampel was one of the

9

school's professional staff and her purpose remained to "teach the didactic and clinical skills" required for students to sit for the national accrediting examination for veterinary technicians. The school provided veterinary care and training to working dogs with the local police department. They also provided surgical services for pets of low-income families.

The accountant submitted essentially the same information about how the parties agreed upon the purchase price. He stated he received new information about the sales of the VCA practice as of the end of February 2022. From this information, he opined the net revenue decreased by 45 percent since the sale of the practice. He then opined there was no goodwill remaining in 2022 from the sold interest in the practice.

In reply, VCA argued the noncompetition agreement contained only one noncompetition clause and the clause was valid. VCA submitted the declaration of Soy Ahn, VCA's senior director of acquisitions. Ahn explained the purchase price was based on a revenue multiplier, which is a common metric "to reflect enterprise value." "The enterprise value reflects the fair value of a business that encompasses all aspects of a practice including not only tangible assets such as equipment but also intangible assets such as the trade name, customer relationships and of course goodwill." Since VCA acquired the remainder of the partnership by way of an equity purchase, rather than an asset purchase, there was no need to itemize each asset and liability encompassed in the sale agreement. VCA paid a lump sum for everything.

When VCA entered the partnership with Creative in 2007, the respective veterinary practices contributed to and combined their goodwill, which grew as they operated a single partnership. VCA purchased the business's goodwill when it purchased Creative's interest in the partnership.

Ahn pointed out that the partnership's 2013 financial statements reflected a goodwill balance of $8,584,207. "VCA determined the amount of [g]oodwill acquired in accordance with [g]enerally [a]ccepted [a]ccounting [p]rinciples . . . as follows: [c]onsideration ([p]urchase [p]rice) plus [a]ssumed [l]iabilities minus tangible assets and other intangible assets separable from [g]oodwill." She stated the resulting goodwill "was the most significant and material asset of the purchase."

Ahn concluded by saying that competition is one of the strongest factors that negatively impacts the value of a veterinary practice. "[T]he presence of a competing practice next door will immediately decrease the value of VCA El Cajon. This diminution will be compounded by the fact that the competing veterinary practice is owned and operated [by] VCA El Cajon's former medical director and board-certified surgeon."

After considering the parties' papers, pertinent deposition testimony, and extensive oral argument, the court granted the preliminary injunction. The court concluded Hampel entered the covenant not to compete in connection with the sale of her business interest and, therefore, the covenant was enforceable under section 16601. The court found VCA had a reasonable probability of success on the merits of their claim and that the relative interim harm weighed in favor of an injunction preventing Hampel from continuing to practice at AGC. The court commented that Hampel did not identify any irreparable harm that would come to her if she were preliminarily enjoined from practicing at that location during this litigation. On the other hand, the court found VCA was likely to suffer harm to its business without an injunction "by having a competitor directly next door." The court stated, "Hampel is enjoined from performing any veterinary practice at AGC, promoting AGC's veterinary practice, or holding herself out

11

to be affiliated with AGC's veterinary practice." The court declined to extend the injunction to the other defendants.

Defense counsel moved for clarification of the order, contending the injunction was vague, overbroad, and unenforceable. The court clarified that Hampel "cannot practice veterinary medicine at that location. Period. Period." Hampel appealed.

The court denied a request to stay the preliminary injunction pending the appeal. The court determined the injunction is a prohibitory injunction, which is not subject to an automatic stay.

DISCUSSION

I.

*General Principles and Standard of Review*

"In deciding whether to issue a preliminary injunction, a court must weigh two 'interrelated' factors: (1) the likelihood that the moving party will ultimately prevail on the merits and (2) the relative interim harm to the parties from issuance or nonissuance of the injunction. [Citation.] . . . [¶] The trial court's determination must be guided by a 'mix' of the potential-merit and interim-harm factors; the greater the plaintiff's showing on one, the less must be shown on the other to support an injunction. [Citation.]" (*Butt v. State of California* (1992) 4 Cal.4th 668, 677–678 (*Butt*).) " ' "[T]he decision to grant a preliminary injunction rests in the sound discretion of the trial court." ' " (*People ex rel. Herrera v. Stender* (2012) 212 Cal.App.4th 614, 629 (*Stender*).)

Our review on appeal "is limited to whether the trial court's decision was an abuse of discretion. [Citation.]" (*Butt, supra,* 4 Cal.4th at p. 678.) "The party challenging the superior court's order has the burden of making a

12

clear showing of such an abuse." (*Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 739.)

"[W]e do not reweigh conflicting evidence or assess the credibility of witnesses; we only determine whether, interpreting the facts in the light most favorable to the prevailing party and indulging all reasonable inferences in favor of the trial court's order, the trial court's factual findings are supported by substantial evidence." (*Stender*, *supra*, 212 Cal.App.4th at p. 630.) Where an issue is resolved upon declarations, "[those declarations] favoring the contention of the prevailing party establish not only the facts stated therein but also all facts which reasonably may be inferred therefrom." (*Brunzell Constr. Co. v. Harrah's Club* (1967) 253 Cal.App.2d 764, 773.)

"Where the likelihood of prevailing on the merits depends upon a question of law . . . , the question on appeal is whether the trial court correctly interpreted and applied the law, which we review de novo." (*Alliant Ins. Services, Inc. v. Gaddy* (2008) 159 Cal.App.4th 1292, 1300 (*Alliant*).) We independently interpret a written contract where the evidence is not in dispute. (*Fillpoint, LLC v. Maas* (2012) 208 Cal.App.4th 1170, 1177 (*Fillpoint*).)

Finally, " 'our decision does not constitute a final adjudication of the ultimate rights in controversy. [Citations.] In reviewing the propriety of a ruling on an application for a preliminary injunction, we merely decide whether the trial court abused its discretion based on the record before it at the time of the ruling.' " (*Midway Venture LLC v. County of San Diego* (2021) 60 Cal.App.5th 58, 77.)

## II.

*The Heightened Scrutiny for Mandatory Injunctions Does Not Apply*

Hampel contends the injunction issued by the trial court is mandatory, requiring us to " ' "scrutinize it even more closely for abuse of discretion." ' " (*Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1047–1048.)  She argues the injunction should be considered mandatory because it compelled her to stop performing veterinary functions at the veterinary technician training school. VCA contends the trial court properly characterized the injunction as prohibitory because it prohibits Hampel from continuing to violate her noncompetition agreement.  We agree with VCA.

" '[T]he general rule is that an injunction is prohibitory if it requires a person to refrain from a particular act and mandatory if it compels performance of an affirmative act that changes the position of the parties.' [Citation.]  An injunction designed to preserve the status quo as between the parties and to restrain illegal conduct is prohibitory, not mandatory, and does not require heightened appellate scrutiny." (*Oiye*, *supra*, 211 Cal.App.4th at p. 1048.)  Courts have said the status quo is " 'the last actual peaceable, uncontested status which preceded the pending controversy.' " (*United Railroads of San Francisco v. Superior Court of San Francisco* (1916) 172 Cal. 80, 87.)

The Supreme Court has explained, "in some instances, an injunction that is essentially prohibitory in nature may involve some adjustment of the parties' respective rights to ensure the defendant desists from a pattern of unlawful conduct. . . .  [A]n injunction preventing the defendant from committing additional violations of the law may not be recharacterized as mandatory merely because it requires the defendant to abandon a course of repeated conduct as to which the defendant asserts a right of some sort.  In

14

such cases, the essentially prohibitory character of the order can be seen more clearly by measuring the status quo from the time before the contested conduct began." (*Daly v. San Bernardino County Bd. of Supervisors* (2021) 11 Cal.5th 1030, 1046.)

Contrary to Hampel's contention, this situation is not like *Clute v. Superior Court of San Francisco* (1908) 155 Cal. 15, 20 where the injunction required an ousted corporate treasurer and manager to affirmatively surrender control of a hotel to its board of directors. Nor is it like *Feinberg v. One Doe Co.* (1939) 14 Cal.2d 24, 27 where a manufacturer was ordered to terminate the employment of an employee who was no longer a member of a union. Those cases involved orders "offer[ing] a remedy for a past violation" as opposed to "prevent[ing] injury from future conduct." (*Daly*, *supra*, 11 Cal.5th at p. 1046.)

Here, the status quo—the last peaceable, uncontested status of the parties which preceded the controversy—was when Hampel was *not* performing veterinary medicine at a veterinary facility next door to VCA El Cajon. The injunction prevents continuing injury from future conduct. Because we conclude the injunction is prohibitory, the rule requiring appellate courts to give greater scrutiny to mandatory injunctions does not apply.

III.

*The Trial Court Properly Granted The Injunction*

A. *The Noncompetition Agreement Is Enforceable*

Hampel agrees she signed the noncompetition agreement in connection with the sale of her business interest, but she contends it should not validly restrict "her efforts arising out of her VCA employment." We disagree. We conclude on this record that VCA demonstrated for purposes of obtaining the

preliminary injunction that the agreement was enforceable and, therefore, VCA had a likelihood of prevailing on the merits of its claims.

"In California, contractual provisions that prevent a person from engaging in a profession, trade or business are generally void. (§ 16600.) . . . '[S]ection 16600 evinces a settled legislative policy in favor of open competition and employee mobility.' " (*Blue Mountain Enterprises, LLC v. Owen* (2022) 74 Cal.App.5th 537, 550 (*Blue Mountain*).) This policy "affirms a person's right to pursue the lawful occupation of his or her choice." (*Strategix, Ltd. v. Infocrossing West, Inc.* (2006) 142 Cal.App.4th 1068, 1072 (*Strategix*).)

Section 16601 provides an exception to this general rule when a noncompetition agreement is connected to the sale of a business: "Any person who sells the goodwill of a business, or any owner of a business entity selling or otherwise disposing of all of his or her ownership interest in the business entity . . . may agree with the buyer to refrain from carrying on a similar business within a specified geographic area in which the business so sold, or that of the business entity, division, or subsidiary has been carried on, so long as the buyer . . . carries on a like business therein."

" 'Section 16601's exception serves an important commercial purpose by protecting the value of the business acquired by the buyer. "In the case of the sale of the goodwill of a business it is 'unfair' for the seller to engage in competition which diminishes the value of the asset he sold." [Citation.] Thus, "[t]he thrust of . . . section 16601 is to permit the purchaser of a business to protect himself or itself against competition from the seller which competition would have the effect of reducing the value of the property right that was acquired." [Citation.] "One of the primary goals of section 16601 is

16

to protect the buyer's interest in preserving the goodwill of the acquired corporation." ' " (*Blue Mountain, supra,* 74 Cal.App.5th at p. 550.)

In *Blue Mountain,* an individual entered into a series of agreements selling his interest in a company and agreeing to serve as the chief executive officer of the newly formed company for five years. The employment agreement included a covenant not to solicit the business of customers for three years after termination of his employment. (*Blue Mountain, supra,* 74 Cal.App.5th at pp. 543–544.) The appellate court upheld the nonsolicitation covenant concluding it was enforceable under section 16601 because the individual disposed of his ownership interest "while concurrently agreeing under the [e]mployment [a]greement to 'refrain from carrying on a similar business within a specified geographic area in which the business so sold.' " (*Id.* at pp. 553–554.) The court determined the agreements were substantially part of one transaction and should be construed together even though they did not reference one another. (*Id.* at p. 554.)

The *Blue Mountain* court followed a similar holding in *Hilb, Rogal & Hamilton Ins. Services v. Robb* (1995) 33 Cal.App.4th 1812 (*Hilb*) in which the appellate court concluded the placement of a noncompetition clause in an employment agreement signed in connection with a merger agreement did not affect the clause's enforceability under section 16601. (*Blue Mountain, supra,* 74 Cal.App.5th at p. 553 citing *Hilb* at pp. 1825–1826.) The noncompetition agreement, which extended for three years following the termination of the defendant's employment with the new company, was enforceable because the defendant disposed of his entire ownership stake in the sold business in exchange for valuable consideration. (*Hilb,* at pp. 1824–1825.) The evidence before the court established the defendant agreed to the

17

noncompetition covenant "in his capacity as a selling shareholder/employee not solely as an employee." (*Id*. at p. 1827.)

Similarly, in *Alliant*, *supra*, 159 Cal.App.4th 1292 , a majority shareholder of a business sold his interest in the business to Alliant and then became employed by Alliant. He signed both a stock purchase agreement and an employment agreement with identical noncompetition covenants that terminated either five years after the effective date of the agreements or two years after the shareholder terminated his employment. (*Id*. at pp. 1295–1297.) The *Alliant* court upheld a preliminary injunction enforcing the noncompetition covenants. (*Id*. at p. 1295.)

*Fillpoint*, *supra*, 208 Cal.App.4th 1170, a case upon which Hampel relies, does not assist her. In that case, the parties signed two separate and distinct noncompetition covenants. One noncompetition covenant was in a stock purchase agreement and required the defendant not to engage in a competing business that distributed and published video games for 36 months after the stock sale. The second noncompetition covenant was in an employment agreement in which the defendant agreed to work for the purchasing company for three years and then further agreed he would not compete with the company for a year after either the expiration of the employment agreement or earlier termination of the defendant's employment. (*Id*. at pp. 1174–1176.) Our colleagues in the Fourth Appellate District, Division Three, considered the case after the trial court granted nonsuit on the basis that the noncompetition covenant found in the employment agreement was unenforceable under section 16600. (*Fillpoint*, *supra*, 208 Cal.App.4th at p. 1176.)

The *Fillpoint* court agreed the purchase agreement and the employment agreement should be construed together. However, it

18

distinguished the covenants before it from the single noncompete covenant found in *Hilb*, *supra*, 33 Cal.App.4th 1812 and the two identical noncompete clauses in *Alliant*, *supra*, 159 Cal.App.4th 1292. Unlike these cases, the *Fillpoint* agreements were distinct and different. The purchase agreement required noncompetition for a specific type of business for a set period after the purchase. The employment agreement contained a broader noncompetition and nonsolicitation covenant for a year after the termination of the defendant's employment. (*Fillpoint*, *supra*, 208 Cal.App.4th at pp. 1179–1181.) The court concluded the differences between the covenants were meaningful. The purchase agreement's covenant not to compete prevented the defendant from setting up a competing business or assisting someone else to set up a competing business for three years after the purchase. "This covenant protected the goodwill of the company, served the purpose of section 16601, and was fully performed." (*Id.* at p. 1182.) The employment agreement's covenant not to compete, however, was broader. For a year after the termination of his employment, it prevented the defendant from: (1) contacting or making sales to clients who were actual or potential customers of the business for two years before his employment terminated; (2) working for or owning a competing business; or (3) employing or soliciting any of the business's employees or consultants. The court found significant the business's concession that the two covenants were intended "to deal with different damages [the defendant] might do wearing the separate hats of major shareholder and key employee." The court determined the covenants in the two agreements were, by their nature, different. "The purchase agreement's covenant was focused on protecting the acquired goodwill for a limited period of time. The employment agreement's covenant targeted an employee's fundamental right to pursue his or her profession."

19

Thus, the *Fillpoint* court concluded the employment agreement's noncompetition covenant did not fit within the limited exception of section 16601. (*Fillpoint*, at p. 1183.) That is not the case here.

This case is more akin to *Hilb* and *Alliant* where there is only one noncompetition clause with a single purpose, to protect the goodwill VCA purchased. The clause had alternate termination points depending on how long Hampel continued to work at the clinic she formerly owned. But a plain reading of the clause shows the covenant itself was directly tied to the sale of Hampel's interest in the veterinary practice. Because the noncompetition clause was tied directly to the sale of the business, we conclude the noncompetition agreement falls within the section 16601 exception.[6]

A noncompetition clause connected to the sale of goodwill of business is meant to "prevent the seller from unfairly depriving the buyer of the full value of its acquisition, including its goodwill." (*Strategix, supra*, 142 Cal.App.4th at p. 1073.) " 'The customers of a business are an essential part of its goodwill. In fact, without their continued custom[,] goodwill ceases to exist, for goodwill is the expectation of continued public patronage. (Bus. & Prof. Code, § 14100.) [¶] When the goodwill of a business is sold, it is not the patronage of the general public which is sold, but that patronage which has

---

[6] The Governor signed a bill on October 13, 2023, which amends section 16600 to indicate that section shall be read broadly, in accordance with *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, "to void the application of any noncompete agreement in an employment context . . . that does not satisfy an exception in this chapter." The amendment clarifies that it "does not constitute a change in, but is declaratory of existing law." (§ 16600, subd. (b) as amended by Stats 2023, ch. 828, § 1 (Assem. Bill No. 1076), effective Jan. 1, 2024.) Because we conclude the noncompetition agreement at issue falls within the section 16601 exception for noncompetition agreements signed in connection with the sale of the goodwill of a business, the pending legislative amendments do not impact our decision.

become an asset of that business.' " (*Smith v. Bull* (1958) 50 Cal.2d 294, 303.) "Although the goodwill of a business may be the result of the personal skill, talent, experience, or reputation of an individual connected with the business, it may attach to and continue with the business even after the separation of the individual on whom it was founded." (*Id.* at p. 302.)

We are not persuaded by Hampel's arguments that any value of goodwill that existed when VCA purchased her interest halted at the culmination of the sale and that she separately built goodwill while employed by VCA. As Hampel continued her employment, her client relationships continued and so did the goodwill VCA purchased.

Where, as here, the goodwill of a business is built largely on relationships and reputation, it follows that the goodwill built by such an individual does not terminate upon the sale of the business when she continues to work there. Rather, the goodwill, based on continued relationships and reputation, carries forward until the individual separates from the business. The alternate termination periods in the noncompetition agreement recognized that if Hampel continued to work at VCA the goodwill she built before the sale would carry forward until she terminated her work with VCA El Cajon. After her separation, the noncompetition agreement protected this goodwill that VCA purchased.

B. *The Trial Court Properly Weighed Relative Harm*

The trial court did not abuse its discretion in weighing the relative harm to the parties and concluding that VCA would be substantially harmed without a preliminary injunction.

We are not persuaded by Hampel's attempts to minimize the ability of VCA to establish harm related to its claims by minimizing the value of goodwill sold. Hampel's accountant argued goodwill should be treated as a

21

depleting asset such that the goodwill sold had no value by the time Hampel terminated her employment. Courts have rejected narrow interpretations of goodwill and have held that section 16601 does not limit goodwill "to transactions involving any quantum of prior sales activity." (*Alliant, supra*, 159 Cal.App.4th at p. 1302.) Rather, covenants not to compete typically focus on "where the business was 'carried on' rather than the extent of the 'goodwill.'" (*Ibid.*, quoting *Monogram Industries, Inc. v. Sar Industries, Inc.* (1976) 64 Cal.App.3d 692, 701.)

We do not reach the issue of whether or how goodwill should be valued on the merits in this case. For the purposes of our review, we observe only that there is substantial evidence to support the court's determination that VCA established a likelihood of prevailing and that it would be harmed without a preliminary injunction. However the parties arrived at the purchase price, there is no dispute VCA purchased the intangible asset of goodwill along with the business. The record contains a financial statement listing the value of goodwill as over $8 million at the time of the sale, based on generally accepted accounting principles. VCA presented the declaration of a VCA regional vice president who stated that goodwill "was the most significant and material asset of the purchase" and that Hampel's association with the neighboring facility "robs" VCA of the goodwill it purchased.

VCA's argument is cogent. VCA would not get the full value of the goodwill it purchased if Hampel could maintain her client relationships while she continued to work at VCA until the first alternative expired and then immediately capitalize on those relationships by drawing them to a competing practice next door after terminating her VCA employment.

In contrast, Hampel did not present evidence she would be harmed by enforcing the noncompetition agreement pending resolution of the merits of

22

this case. She is not barred from practicing at a location outside the radius identified in the noncompetition agreement. She is not barred from teaching online or classroom courses. She is only barred from practicing veterinary medicine at the teaching hospital next door until resolution of the merits of the case.

For these reasons, we conclude the trial court properly exercised its discretion to issue the preliminary injunction.

IV.

*The Preliminary Injunction Is Appropriate*

The court's order enjoins Hampel "from performing any veterinary practice at AGC, promoting AGC's veterinary practice, or holding herself out to be affiliated with AGC's veterinary practice." Hampel contends the injunction is outside the scope of the pleadings and is vague because the term "veterinary practice" is not the term VCA used in its pleadings. We are not persuaded.

A. *VCA Requested the Relief Granted*

Hampel, who has been a veterinarian for over 40 years, acknowledged the noncompetition agreement she signed limited her ability to own a companion animal "veterinary medical practice" within 20 miles of VCA El Cajon. Hampel's announcement on her personal Web site said she was relocating to her new "privately owned veterinary practice . . . ."

Before the lawsuit was filed VCA sent Hampel a letter asking her to cease and desist from opening or operating a competing veterinary practice in violation of the noncompetition agreement. When, after several unsuccessful mediation sessions, the defendants opened the competing facility, VCA filed suit alleging Hampel and her husband were operating a competing veterinary practice in violation of the noncompetition agreements. VCA asked for an

23

injunction precluding the defendants from opening or operating AGC in violation of the agreements.

The operative first amended complaint prayed for, among other things, a preliminary injunction requiring the defendants to "refrain from operating any animal veterinary medical practice" at the neighboring property.

VCA's notice of motion for preliminary injunction sought to enjoin all defendants "from performing any veterinary services" at AGC until the judgment in this case. Throughout the motion, VCA discussed the need for an injunction because Hampel and her husband opened and were operating a competing "veterinary practice" at a location next door to VCA El Cajon.

When Hampel asked the court to clarify the scope of the injunction, the court stated, "She cannot practice veterinary medicine at that location. Period. Period."

The cases cited by Hampel for her argument that the injunction is somehow outside the scope of the pleadings are inapposite. This is not an appeal on a judgment roll such as *Marvin v. Marvin* (1981) 122 Cal.App.3d 871, 875 where the appellate court's review was limited to only the pleadings because it did not have the benefit of the evidence presented to the trial court. Nor is it a situation where a legal theory supported by the evidence was not properly pleaded, as in *Crescent Lumber Co. v. Larson* (1913) 166 Cal. 168, 171. Similarly, Code of Civil Procedure section 580, subdivision (a), which limits relief on a default judgment to that demanded in the complaint has no application here because the purpose of that section is to ensure the defaulting party has adequate notice of the maximum judgment that may be assessed against it. (*Los Defensores, Inc. v. Gomez* (2014) 223 Cal.App.4th 377, 398.)

Hampel had ample notice that VCA sought a preliminary injunction to preclude her from practicing veterinary medicine at the neighboring facility, even in the context of teaching, until this case can be resolved on the merits. She had the opportunity to present evidence in opposition to the request. As the case progresses, she may continue to present evidence about the scope of her conduct to either establish it does not violate the agreement or to further clarify the scope of any relief the trial court may ultimately grant. Therefore, the court's order on the preliminary injunction did not violate due process. (*Midway Venture LLC v. County of San Diego* (2021) 60 Cal.App.5th 58, 77–78 (*Midway*).)

B. *The Injunction is Not Vague, Ambiguous, or Overly Broad*

" 'An injunction must be narrowly drawn to give the party enjoined reasonable notice of what conduct is prohibited.' [Citation.] It 'must be sufficiently precise to provide a person of ordinary intelligence fair notice that her contemplated conduct is forbidden.' " (*Midway*, *supra*, 60 Cal.App.5th at p. 92; see also *People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1115; *In re Berry* (1968) 68 Cal.2d 137, 156; *People ex rel. Gascon v. HomeAdvisor, Inc.* (2020) 49 Cal.App.5th 1073, 1082 [" 'An injunction must be sufficiently definite to provide a standard of conduct for those whose activities are to be proscribed"].) In other words, the enjoined party must be able to determine what they may or may not do to comply for an injunction to be valid. (*People v. Gordon* (1951) 105 Cal.App.2d 711, 725; *City of Redlands v. County of San Bernardino* (2002) 96 Cal.App.4th 398, 415.)

The record shows the trial court carefully considered the evidence and weighed the potential harm to each party before fashioning the preliminary injunction enjoining Hampel "from performing any veterinary practice at AGC, promoting AGC's veterinary practice, or holding herself out to be

25

affiliated with AGC's veterinary practice" pending trial of this matter. Hampel's claim that she cannot understand the term "veterinary practice" appears disingenuous, at best. As the court clarified, "She cannot practice veterinary medicine at that location."

The injunction is narrowly drawn. In contrast to the relief sought by VCA, it only enjoins Hampel from practicing veterinary medicine at the facility next to VCA El Cajon. It does not limit Hampel's ability to practice outside the 20-mile radius of the clinic. It does not limit Hampel's ability to teach so long as she is not practicing veterinary medicine next door. Nor does it limit Johnson's ability to practice veterinary medicine, even at the neighboring facility. Based on this record, we conclude the trial court did not abuse its discretion.

## DISPOSITION

The order is affirmed. VCA may recover its costs on appeal.


IRION, Acting P. J.

WE CONCUR:



DATO, J.



BUCHANAN, J.


26